## STANDARD OIL CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 7816.

Circuit Court of Appeals, Seventh Circuit.

June 12, 1942.

Rehearing Denied Aug. 5, 1942.

Charles D. Hamel and Lee I. Park, both of Washington, D. C., and B. F. Jones, of Chicago, Ill., for petitioner.

J. P. Wenchel, and Charles E. Lowery, both of Washington, D. C., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch, Sewall Key, and Samuel H. Levy, Sp. Assts. to Atty. Gen., for respondent.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

EVANS, Circuit Judge.

This Federal income tax case is an outgrowth of the "Teapot Dome" leases and litigation, and involves two comparatively narrow issues: (1) The deductibility for the tax year 1930, of a loss, business expense, or bad debt item, allegedly sustained by petitioner, in the sum of $2,906,484.32, which was the amount of a consent judgment entered in a tort suit against petitioner's wholly-owned subsidiary. (2) The proper basis for the calculation of the depreciation of a certain patent, once of great value.

The Board of Tax Appeals held in Commissioner's favor on both issues, and determined a $409,819.78 tax deficiency for the year 1930.

I. *The Facts as to Item (1)—The De-ductibility of the Amount of the Consent Judgment.* The parties stipulated as to most of the case history, which is herewith chronologically set forth.[1]

Petitioner, Standard Oil Company, is the parent corporation of twenty subsidiaries, one of which is Stanolind Crude Oil Company (hereinafter called Stanolind)[2] which joined the petitioner's family, September 22, 1930, as a wholly-owned subsidiary.

Prior thereto, but in the same year, to-wit, on May 28, 1930, Stanolind had consented to the entry of a $2,906,484.32[3] judgment against it in favor of the United States, in the Federal District Court in Delaware. This was pursuant to agreement authorized by Joint Resolution of Congress. This suit is, by the parties, referred to as the Delaware suit. It is this judgment

---

[1] Chronological history:

| | |
|---|---|
| June 18, 1889 | Standard Oil organized. |
| March 5, 1921 to March 4, 1923 | Albert Fall, Secretary of the Interior. |
| May 31, 1921 | President's executive order authorizing oil leases. |
| April 7, 1922 | Lease to Mammoth by Fall and Denby. |
| April 29, 1922 | Senate Resolution authorizing investigation of other Government leases to Mammoth. |
| October 24, 1922 | Contract of Stanolind to purchase oil from Mammoth. |
| February 9, 1923 | Supplemental agreement. |
| February 8, 1924 | Congressional authorization for President to sue to cancel leases. |
| March 13, 1924 | Wyoming suit of United States v. Mammoth Oil Co., Stanolind, et al. |
| June 19, 1925 | District Court decision, 5 F.2d 330, favorable to Mammoth. |
| September 28, 1926 | CCA decision, 14 F.2d 705, reversing Wyoming District Court. |
| October, 1927 | U. S. Supreme Court decision affirming CCA, 275 U.S. 13, 48 S.Ct. 1, 72 L.Ed. 137. |
| August 17, 1928 | Judgment in United States v. Mammoth. |
| December, 1928 | Delaware suit—United States v. Stanolind. |
| December 27, 1928 | $3,509.19 paid on Mammoth judgment by receiver of Mammoth. |
| April 2, 1930 | Escrow to cover judgment and stipulation of settlement of Delaware suit v. Stanolind. |
| May 13, 1930 | Joint Resolution of Congress approving settlement. |
| May 28, 1930 | Judgment against Stanolind by confession in Delaware suit for $2,906,484.32. |
| June 17, 1930 | Judgment satisfied. |
| Sept. 22, 1930 | Stanolind joined petitioner who filed thereafter a consolidated income tax return. |
| Dec. 12, 1933 | Petitioner's claim for tax refund. |

[2] Up to September, 1930, Stanolind had been owned half by Standard Oil Co. (petitioner) and half by Sinclair Cons. Oil Co. Standard bought Sinclair's half interest in September. It is a wholly-owned Standard subsidiary, incorporated in Delaware. It was formerly called Sinclair Crude Oil Purchasing Co.

[3] The amount of $2,906,484.32 was inclusive of interest to April 4, 1930. The sum of $2,906,484.32 was arrived at in this way:

| | | |
|---|---:|---|
| Stanolind paid | $2,167,591.26 | to Mammoth for the oil |
| less | 170,000 | credit to S. for storage tanks |
| | 1,997,591.26 | |
| plus | 994,002.80 | 7% interest liability |
| | 2,991,594.06 | |
| less | 86,275.00 | interest on $170,000 credit |
| | 2,905,319.06 | |
| plus | 1,165.26 | —3 days' extra interest at 7%, daily $388.42. |
| | 2,906,484.32 | |

which furnished the fuel for the controversy over item (1).

Stanolind's liability for the judgment arose out of the fact that it purchased 1,430,024.70 barrels of crude oil, prior to March 12, 1924, from Mammoth Oil Co.[4] pursuant to contract,[5] paying therefor $2,167,591.26.[6] It had been a co-defendant with Mammoth in the Wyoming suit instituted by the United States, March 13, 1924, to secure the cancellation of the Teapot Dome lease.

Mammoth obtained the oil by drilling on certain Government owned lands in Wyoming, commonly known as Teapot Dome, to which the Government had given oil and gas leases,[7] executed on April 7, 1922. These leases had been voided by the U. S. Supreme Court for fraud. 275 U.S. 13, 48 S.Ct. 1, 72 L.Ed. 137. Stanolind was neither a party to, nor was it mentioned in, either of these lease agreements.

The oil and gas leases to Mammoth have been judicially[8] declared to have been fraudulently obtained and void. The suit which led to the decree of cancellation was begun in the United States District Court of Wyoming against Mammoth Oil Co., Stanolind, et al. The parties refer to this suit as the Wyoming suit.

Because of Mammoth's inability, through insolvency,[9] to satisfy the $2,294,597.74 judgment, plus seven percent interest (on which $3,509.19 only had been paid, December 27, 1928), the Government pursued Stanolind, as the purchaser of the illegally obtained oil. This suit was begun in the District Court of Delaware in December, 1928, and it was for the conversion of 1,430,024.70 barrels of oil, valued at $2,168,252.57. In 1929, Stanolind offered to terminate the suit by paying to the U. S., $2,167,591.26.[10]

Counsel for the Government recommended to Congress, April 3, 1930, that Stanolind's offer be accepted. The sum of $2,906,484.32 had been deposited in a bank in escrow pending completion of the negotiations. The proposed agreement was approved by Joint Resolution, May 13, 1930, and judgment was entered in the Delaware Federal District Court, May 28, 1930, pursuant to such settlement. It was paid in full by Stanolind, June 2, 1930. Stanolind has no hope of recoupment against Mammoth.

Stanolind filed its separate return for the period January 1 to September 21 (the day before affiliation with petitioner), 1930. It showed a net loss for that period. In its return it claimed a deduction of $2,901,865.46.[11] Petitioner filed a consolidated return for the balance of the year 1930, i. e., September 22 to December 31, 1930, and carried this net loss forward.

The Commissioner in his deficiency notice not only disallowed the $2,901,865.46, but added to Stanolind's income, $256,374.18 which was composed of the offset of $170,000 on the storage tanks' salvage value, plus $86,374.18 interest thereon.

The deductibility of the amount paid by petitioner to satisfy this consent judgment, from petitioner's gross income turns upon the character and nature of the judgment

---

[4] Mammoth Co. was incorporated by Harry F. Sinclair, Feb. 28, 1922. Its entire capital stock was issued to said Sinclair for $1,000, and his services in procuring an oil and gas lease from the U. S. Government on certain Government owned lands in Wyoming, known as Naval Petroleum Reserve No. 3, and commonly called "Teapot Dome." Shortly thereafter Sinclair Consolidated Oil Co. acquired the stock of Mammoth.

[5] October 24, 1922, a tri-partite agreement between Mammoth, Stanolind, and Midwest.

[6] Stanolind sold the oil prior to 1928 and reported the income therefrom (but since it sustained net losses for the years 1923-7, it paid no income tax thereon). It paid an income tax in 1928.

[7] A supplemental lease was entered into between Mammoth and the United States (by Albert Fall) on February 9, 1923.

[8] Suit was instituted by the United States in District Court, March 13, 1924; decided June 19, 1925, 5 F.2d 330; reversed by 8 Cir., 14 F.2d 705; CCA affirmed by Supreme Court, 275 U. S. 13, 48 S.Ct. 1, 72 L.Ed. 137. Decree of District Court of Wyoming, pursuant to Supreme Court mandate, entered August 17, 1928.

[9] Assets of $68,598.31 and liabilities of $1,874,217.88.

[10] The price Stanolind had paid Mammoth for the oil, less $170,000, the estimated value of the oil storage tanks belonging to Stanolind on said leased property, plus interest at the rate of seven percent.

[11] The $2,906,484.32 amount of the judgment, less a credit for a $4,618.86, the amount of an existing liability of Stanolind to Mammoth.

which was paid. Set forth in the margin[12] are the pertinent extracts from the pleadings and decisions in the two suits (the Wyoming suit and the Delaware suit) above mentioned.

On this issue, the Board of Tax Appeals specifically found:

"The lease of April 7, 1922, and the supplemental agreement of February 9, 1923, were executed (by Mammoth and U. S.

---

12 Complaint in Wyoming suit:

"* * * Albert B. Fall and the said Harry F. Sinclair, acting for and on behalf of defendant Mammoth * * * did combine, conspire and confederate to defraud the U. S. * * * by the execution of a lease * * * Said contracts were * * * illegal * * * and void * * *.

"Defendant (Stanolind) claims to have and to hold certain rights derived from defendant Mammoth * * * and * * * has erected and maintained certain structures upon the lands * * *. Plaintiff avers that said defendant (Stanolind) although alleging certain rights to be upon said land, derived from * * * Mammoth * * * is nevertheless a *trespasser* upon said lands. * * *

"That * * * (Stanolind) make discovery * * *."

Answer of Stanolind in Wyoming suit:

"* * * this defendant denies that it is a trespasser upon said land for the reasons hereinafter set forth * * *."

The Eighth Circuit Court of Appeals, 14 F.2d 705, 730, found:

"* * * the reasonable inference is that Sinclair was one of the principals and shared in the profits of this transaction. * * * Appellee Mammoth Oil Company being the creature of Sinclair, its acts being his acts. * * *

"Appellees Sinclair Crude Oil Purchasing Company [Stanolind] * * * claim certain rights which are derived from appellee Mammoth. * * *

"Appellee [Stanolind] * * * evidently controlled by Mr. Sinclair, purchased from the Mammoth Oil Company * * * steel oil storage tanks on naval reserve * * * and became substituted as to the rights of the Mammoth Oil Company to maintain the same. * * * The rights of * * * [Stanolind] * * * are based upon the lease of the Mammoth Oil Company. Credit in the accounting or otherwise for moneys expended by these appellees could only be allowed if they were innocent trespassers and expended the money and made the improvements in good faith.

"*As our conclusion is that the lease and contract were procured through fraud and corruption, each of the appellees is a mala fide trespasser on the government lands, and therefore no credit for expenditures can be allowed any of*

*them by the court, and a full accounting of the value of the oil extracted must be rendered.*" (Italics ours).

The Supreme Court opinion, 275 U. S. 13, at page 35, 48 S.Ct. 1, 4, 72 L.Ed. 137:

"Were the lease and supplemental agreement fraudulently made? The decisions below are in conflict, and we have considered the evidence to determine whether it establishes the charge. The complaint states that the lease and agreement were made as the result of a conspiracy by Fall and H. F. Sinclair to defraud the United States; that Fall acted for the United States and Sinclair acted for the Mammoth Oil Company; that the negotiations were secret, and the lease was made without competition * * * and, in general terms the complaint charges that Fall and Sinclair conspired to defraud the government by making the lease without authority and in violation of law and to favor and prefer the Mammoth Company over others.

"As is usual in cases where conspiracy to defraud is involved, there is here no direct evidence of the corrupt arrangement. Neither of the alleged conspirators was called as a witness. The question is whether the disclosed circumstances prove the charge. * * * About April 21, information concerning the lease was given in response to a Senate resolution. There was never any legitimate reason for secrecy. * * * Fall sent Denby a draft of the amendment and undoubtedly thought its adoption would authorize the exchange of oil for the storage facilities contemplated by the lease. Under the circumstances his failure to submit the lease to the Attorney General or to any lawyer in his own Department indicates that he knew that the transaction was liable to be condemned as illegal, and that, without regard to the law, he intended to put it through. * * *

"But the failure of Sinclair to testify stands on a different basis. Having introduced evidence which, uncontradicted and unexplained, was sufficient to sustain its charge, the United States was not required to call the principal representative of the company. His silence makes strongly against the company. It is as if he personally held the lease, were defendant, and failed to testify. * * * While Sinclair's failure to testify cannot

agents) without warrant or authority of law and contrary to the policy of the United States to conserve its petroleum resources. The lease and agreement were fraudulent.

*Stanolind is charged with notice that those agreements were executed contrary to law, and with knowledge of the fraud perpetrated. Stanolind acted in bad faith and as a*

properly be held to supply any fact not reasonably supported by the substantive evidence in the case * * * it justly may be inferred that he was not in position to combat or explain away any fact or circumstance so supported by evidence and material to the government's case. * * *

"It requires no discussion to make it plain that the facts and circumstances above referred to require a finding that, pending the making of the lease and agreement, Fall and Sinclair, contrary to the government's policy for the conservation of oil reserves for the Navy, and in disregard of law, conspired to procure for the Mammoth Company all the products of the reserve on the basis of exchange of royalty oil for construction work * * * that Fall so favored Sinclair and the making of the lease and agreement that it was not possible for him loyally or faithfully to serve the interests of the United States or impartially to consider the applications of others for leases in the reserve; and that the lease and agreement were made fraudulently by means of collusion and conspiracy between them.

"The lease gave the Mammoth Company the right to construct tanks and other operating facilities on the reserve. In January, 1923, the petitioner [Stanolind], bought from that company the tanks already constructed and others being built thereon. It used them to store * * * oil that it bought from the government. It claims that it relied on the validity of the lease and became the owner of the tanks as licensee and grantee of the lessee, and entitled to maintain them in all respects as the lessee was entitled to do under the lease. It contends that the Circuit Court of Appeals erred in directing it to be restrained from further trespassing upon the reserve, and that in any event it should be given opportunity to remove its property. But the Purchasing Company [Stanolind] is presumed to have known that no law authorized the making of any such lease. The existence of that arrangement for the exhaustion of the reserve was calculated to excite the apprehensions of one considering such a purchase and put him on his guard rather than to give assurance of safety. The use of such tanks to take oil from the reserve was a part of the illegal scheme. Moreover [Stanolind] was owned half and half by the Sinclair Consolidated Oil

Corporation and the Standard Oil Company of Indiana. Sinclair was chairman of the board of the former, and Stewart held like position in the latter. Shortly before [Stanolind] bought the tanks these chairmen acted for and controlled it in respect of most important transactions. That and other disclosed circumstances are sufficient to impute to it Sinclair's knowledge of the conspiracy to defraud by which the lease was obtained. It is clear that, in respect of the use and removal of these tanks, the [Stanolind] is in no better position than the Mammoth Company would have occupied, if it owned them.

" * * * The tanks, pipe line * * * put upon the reserve for the purpose of taking away its products were not authorized by Congress. The lease and supplemental agreement were fraudulently made to circumvent the law and to defeat public policy. No equity arises in favor of the lessee or the other petitioners to prevent or condition the granting of the relief directed by the Circuit Court of Appeals. Petitioners are bound to restore title and possession of the reserve to the United States, and must abide the judgment of Congress as to the use or removal of the improvements or other relief claimed by them. * * *"

The Complaint in the Delaware suit alleged:

" * * * the said defendant, well knowing the said crude oil to be the property of the said plaintiff and of right to belong and appertain to it but contriving and fraudulently intending craftily and subtly to deceive and defraud the said plaintiff in this behalf hath not as yet delivered the said crude oil or any part thereof, to the said plaintiff * * * and * * * converted and disposed of the said crude oil to its own use * * *. * * *

" * * * that Stanolind 'then and there well knowing of the wrongful, wilful, unlawful and fraudulent character' of the acts of Mammoth, and well knowing the fraudulent character of the pretended lease, and well knowing that the crude oil at the time of its delivery to Stanolind was the absolute and unconditional property of the U. S.; and that Stanolind 'with all the knowledge aforesaid, but covinously contriving and fraudulently intending to deceive and defraud the plaintiff in this behalf * * * wrongfully, wilfully, unlawfully and fraudulently converted and manufactured

*mala fide trespasser upon the Government-owned lands in acquiring the 1,430,024.70 barrels of oil in question."* (Italics ours.)

Petitioner assails this finding, and contends that the judgment (and findings) in the suit, brought by the United States to set aside leases for the oil unlawfully taken from Teapot Dome, can have no weight as support for the Board's findings. In brief, it argues this judgment may not be treated as res judicata of the character of the transaction, in this, an independent, unconnected tax suit.

Two issues arise as to the deductibility of the Delaware judgment, i. e., (a) Whether the whole or any part of the consent judgment is deductible on any theory of income tax law, such as a deduction for an ordinary and necessary business expense, a loss, or a bad debt. (b) If otherwise deductible as a necessary business expense, a loss or a bad debt, was the Board justified in rejecting it on the ground of public policy, due to the criminal misconduct of parties in obtaining the oil?

Petitioner's chief reliance is based on the proposition that the former adjudication in the Wyoming suit is not res judicata of its mala fides or fraudulent intent because this is a different and distinct proceeding, a proceeding to assess an income tax.[13]

We must reject petitioner's contention respecting the irrelevancy of this past litigation. We are here determining, for the purpose of ascertaining an income tax, the nature of a transaction, and an expenditure (or loss) incident thereto, which was the subject-matter of former litigation. To learn the circumstances under which the legal liability was declared in the court's

decree, we must look into that former litigation. We have here the same parties and the same issues, although the issues are viewed and appraised in a different legal proceeding. We are not the originators, the pioneers in determining how that legal liability should be characterized. It has been twice litigated. It was finally disposed of by a consent decree, initiated by petitioner, and based upon the pleadings of the case. We are merely dealing with the resultant of that litigation, the effect and consequences which are largely determined by the pleadings and findings, the entry of which preceded the decrees.

Furthermore, we have the finding of the B. T. A. that the transaction was mala fides and fraudulent, and this fact finding is we think, supported by substantial evidence in the record before us and by the public documents available to us. Such a finding of fact by the Board must therefore be accepted by us. Elmhurst Cemetery Association v. Commissioner, 300 U.S. 37, 57 S.Ct. 324, 81 L.Ed. 491.

As the Government points out in its brief, serious doubt as to the validity of Government leases to Mammoth had been raised four months before Stanolind executed its contract with Mammoth. It must have had more than a suspicion as to Mammoth's legal right to sell the oil. At least the Board, as did the courts, had a substantial basis for their findings as to Stanolind's knowledge, when it bought the oil from Mammoth, of the fraud and corruption in the Fall lease to Mammoth.

We will now take up separately the grounds upon which the taxpayer predicates this deduction.

---

the said crude oil into fuel oil and other * * * products * * *. On this count * * * damages were sought * * *."

In the letter from the Government Attorneys (Roberts and Pomerene) to Congress asking for a resolution approving the settlement, it was said:

"This suit was for the conversion of the oil by (Stanolind) * * * based upon the theory that as the Mammoth Oil Co. had never acquired a valid title to the leasehold it could not give good title to the oil taken therefrom. * * *

"You will also remember that * * * (Stanolind) erected some 17 storage tanks of the capacity of 55,000 barrels per tank on the reserve for the storage of oil. These have now only a second-hand or scrap value and this value is estimated

at about $10,000 per tank or $170,000 in all. The Navy has leased some of these tanks for storage of oil and it is thought that they may be of use in the future. * * * As we have heretofore advised, we consider this a very advantageous settlement to the Government. * * * Under the proposed arrangement the Government is, we think, getting as favorable a result as it could get by pursuing the litigation to judgment and execution."

13 Sunshine Coal Co. v. Adkins, 310 U.S. 381, 402, 403, 60 S.Ct. 907, 84 L. Ed. 1263; George H. Lee Co. v. Federal Trade Comm., 8 Cir., 113 F.2d 583; National Foundry, etc., v. Oconto Water Supply Co., 183 U.S. 216, 22 S.Ct. 111, 46 L.Ed. 157.

The Government maintains that the deductions authorized by the statute are mutually exclusive, i. e., an item may be claimed to be deductible under a particular phrase, such as a "bad debt" or a "loss" but it cannot be contended generally that the item is deductible under one or another provision of the statute.[14] Setting to one side for the moment this contention, we will consider each of the statutory grounds upon which the judgment which the taxpayer paid might possibly be deducted from its gross income.

"§ 23. In computing net income there shall be allowed as deductions: (a) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * * (b) All interest paid or accrued within the taxable year on indebtedness * * * (f) * * * losses sustained during the taxable year * * * (j) Debts ascertained to be worthless and charged off within the taxable year * * *." 26 U.S.C.A. Int. Rev.Acts, pages 356, 357.

1. Was the judgment deductible as a "bad debt"? Petitioner so argues, on the theory that under the contract of sale of the oil from Mammoth to it, there was a title warranty[15] provision, which was breached, on which warranty no recovery could now be made because of Mammoth's insolvency.

The section above quoted permits a deduction for "debts ascertained to be worthless and charged off within the taxable year." In the language of the income tax lawyers, these are called bad debts.

Our conclusion is that this judgment was not deductible as a bad debt. Doubtless it might have been called, generically a debt. Likewise, if it were a debt, it could be quite legitimately called a bad debt. But was it a "bad debt" as that term was used in the above-quoted section of the Revenue Act? We think not.

We must distinguish between an alleged cause of action growing out of an implied warranty made by one in pari delicto with another, and a bad debt allowable as a deduction. Petitioner may have had an alleged cause of action under the warranty provision which Mammoth gave it. However, it does not follow that it could recover on such alleged cause of action, or for contribution, if both parties were in pari delicto.

Under the decisions which recognize an exception to the law of contribution[16] we conclude Stanolind had no enforceable right to contribution from its co-tort feasor or co-actor in illegal action.

There is involved here another question—a broader question, one of public policy, which bars this asserted deduction.[17] The judgment was obtained by the United States against Stanolind and was for damages suffered by the United States when property was unlawfully and illegally taken from the United States. A corporate entity, had through criminal connivance, possessed itself of the property of the United States. It sold this property (oil) to Stanolind, a subsidiary of petitioner. When the sale was made, the corrupter, Mammoth's owner, was half owner of Stanolind. United States sued Stanolind, when it was half owned by petitioner, for damages sustained because of Mammoth's illegal and criminal action in getting property belonging to the United States.

The complaint in the suit against Stanolind charged it, jointly with Mammoth, with the fraud and corruption by which Mammoth obtained possession of the oil. On such pleading, Stanolind consented to the entry of the judgment in question.

Assuming first that Stanolind's position, so far as fraud and corruption are concerned, is no better than Mammoth's, a court would have no difficulty in refusing this deduction on the general ground of public policy.

The only question which arises is over the distinction which petitioner seeks to make between the action of Stanolind which purchased the oil from the producer, a co-subsidiary, and Mammoth's action, whose criminal misconduct was the basis of the alleged loss. Petitioner charges Mammoth with being the sole iniquitous actor, the only criminal. It asserts Stanolind, although

---

[14] Spring City Co. v. Commissioner, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200; H. D. Lee Mercantile Co. v. Commissioner, 10 Cir., 79 F.2d 391.

[15] "Each of the vendors does warrant the title to all crude oil sold and delivered by it under this agreement, and agrees to hold the purchasing compa-ny harmless from all claims of any person or corporation to such crude oil."

[16] American Jurisprudence, Contribution, Sec. 36.

[17] See informative case note "Deductions of Business Expenses: Illegality and Public Policy," 54 H.L.R. 852.

owned in part, in common with Mammoth, by Sinclair, did not know of Mammoth's criminal misdeeds and at most was aware of the unlawful or improper (as distinguished from criminal) action of Sinclair and his creature, Mammoth, in getting the lease of the Teapot Dome property from which the oil was taken. In other words, it was a purchaser who, though not exactly innocent, was not possessed of the knowledge of the infamy of the transaction, so fully described in the above-cited decisions of the Circuit Court of Appeals and the U. S. Supreme Court.

The line which differentiates tort judgments into two groups, one deductible and one non-deductible, is not easily or clearly defined. Yet we think it tolerably safe to say that torts which are committed against the Government and which are also violative of the criminal statutes may not furnish the basis of deduction.

The shadowy character of the line of demarcation and the uncertainty of the curves which mark the course of this boundary line are illustrated by the allowance of deductions for losses growing out of gambling and wagering transactions in some instances and the disallowance of such asserted deductions in other cases. The differences in the state criminal statutes seem to afford the ground for the different holdings. But, uncertain and indistinct as the line may be, we have found no case which permits a taxpayer to successfully claim a deduction based on a sum which said taxpayer has paid the Government by way of damages which arose from a fraud which the said taxpayer perpetrated upon the Government.

And it is apparent that the case against the allowance of deductions is strengthened, if the facts warrant a finding that the taxpayer made payment to the Government, not alone because of fraud, but because of criminal corruption, to-wit, bribery.

The fact that the instant judgment was for damages arising out of a tort against the Government, distinguishes it from cases where the damages arise out of a tort against an individual. Adding to this, the distinguishing fact, that the tort in this case arises out of bribery and not a lesser degree tort, like negligence, we can more readily see the necessity of applying the defense of "against public policy."

It is hardly necessary, in view of the foregoing discussion, to consider separately the alleged deduction on either of the other grounds mentioned in Section 23 of the Revenue Act of 1928. The same defense, to-wit, against public policy, would apply, whether this item be viewed as "an ordinary and necessary business expense," or "as a loss sustained during the taxable year."

In passing, however, it might be observed, the deduction if allowable at all, would, we think, fall under the heading of a bad debt, rather than as an ordinary and necessary business expense, or a loss. As a loss or an ordinary and necessary business expense, the asserted deduction was subject to other defenses.

We think it fair to the taxpayer to say that its chief contention is denial of participation with Mammoth Company in this immoral venture.

Strongly insisting that there is no evidence of its guilt, save that which may be found in the findings and judgments in the Wyoming and Delaware suits, it asserts it was negligent and careless, but no more.

With this position, we can not agree. In reaching this conclusion we have entirely eliminated from our consideration, the evidence which the two judgments and the pleadings and findings in the two suits afford. Looking only to the other evidence, the conclusion is inescapable that support for the finding of the Board is abundantly present. That Sinclair bribed the Secretary of Interior in order to obtain the Teapot Dome lease is established. The lessee thereupon turned over this lease to his wholly-owned subsidiary, the Mammoth Company. It, Mammoth, was financially irresponsible, having been organized by Sinclair, the corrupter of Secretary Fall. Its entire capital stock of a thousand dollars was issued to Sinclair for services in procuring the oil and gas lease from the United States Government. Sinclair transferred this stock in Mammoth to the Sinclair Consolidated Oil Company.

Stanolind was owned, half by Sinclair Cons. Oil Co., and half by petitioner. Thus did ownership of both companies stand when Stanolind entered into its contract with Mammoth to purchase the illegally obtained oil drawn from the Teapot Dome property. In other words, Mammoth was Sinclair. It was clearly chargeable with knowledge of Sinclair's criminal action in corruptly obtaining the Teapot Dome lease.

Sinclair also owned half of Stanolind, and Stanolind, after Sinclair had acquired half of its stock, purchased the oil obtained through the fraudulently executed lease of the Teapot Dome property. Not only was Stanolind chargeable with knowledge possessed by Sinclair, but these same facts invite the query to which an answer is hardly necessary. May one who, through bribery, secures a lease from the Government, which he turns over to a company owned by himself, avoid liability arising out of his criminal misconduct and demand protection on the theory that the corporation created by him to carry out the object of his criminal enterprise, had no knowledge of the fraud or corruption?

Moreover, it would overtax credulity to assume, under the circumstances, that petitioner was an innocent party, unaware of what was going on at a time when Senators in the Senate and the press were charging corruption and demanding an investigation of the conditions under which the Teapot Dome lease was negotiated.

Petitioner most earnestly contends that its good faith, as well as its innocence, of any charge of criminal misconduct is conclusively established by the proposed settlement which Stanolind made and which was approved by Congress, upon the recommendation of the able counsel who represented the Government in this litigation.

It asserts that, "The allowance of the offset for the tanks was a recognition that Stanolind had acted honestly and in good faith."

Its position is that a tort feasor may not recover reimbursement for improvements erected in the course of a venture conceived in bad faith and tortious and criminal in character. Therefore, it argues, an allowance of such salvage value of the tanks in the settlement approved by Congress was indisputable evidence absolving Stanolind of all bad faith and criminal misconduct.

While we may concede that a tort feasor of the character here disclosed may not validly claim improvements which he made during a trespass, it would not necessarily follow as a corollary that since the offset of the improvement made by the alleged tort feasor was permitted in the settlement of the controversy, that, a fortiori, the person was not a tort feasor.

The Government attorneys, in their recommendation for settlement to Congress, were confronted by a practical situation. They were terminating protracted litigation. They were offered their own estimate of value of the oil, with interest at seven percent. for a period of some seven years. They were obtaining the tanks at salvage value, which value was less than their usage value.

Upon these facts, conflicting arguments, based on different deductions, might well be advanced. Petitioner has forcefully presented its contention, which is that the amount of its total payment represented a deduction from the value of the oil, of the salvage value of its tanks. From this fact, it presses its conclusion that such allowance would never have been made save on the statement of counsel to the United States Senator Walsh, which we quote:

"As we have heretofore advised, we consider this a very advantageous settlement to the Government. The legal rate of interest in Wyoming is 7 per cent. Under the terms of the settlement the defendant pays this rate of interest. While we believe that we could recover interest at the rate of 7 per cent were we to try the case, still there is a question whether the Delaware court would award interest at that rate since the legal rate in Delaware is 6 per cent.

"Under the proposed arrangement the Government is, we think, getting as favorable a result as it could get by pursuing the litigation to judgment and execution.

"We should add that the defendant under the terms of the settlement must pay the costs of the litigation."

It argues that this letter was tantamount to an admission that the alleged bad faith and criminal misconduct of Stanolind could not be proven on the trial.

Quite as persuasive,—in fact more so we think,—is the inference that the Government was getting at least the full value of its oil—a very large sum—to which interest at the highest possible rate was to be added. It also was to receive tanks which had been erected on the Dome. The amount it accepted could have been reached by computing interest at 6 percent. instead of 7 percent. without any allowance for the tanks. Also, it could be plausibly argued that the amount which was accepted, and the reason for the acceptance of the offered sum, were the desire to terminate litigation which had been running for more than six years and which was disagreeable from start to finish, because the facts upon which it was based

were humiliating to all good American citizens.

■ We do not either discredit or reject petitioner's argument. It was, at most, only one of the factors or bits of evidence, upon which the Board made its findings. We can not say it is sufficient to overthrow the finding by the Board, which we are permitted to review only to the extent of ascertaining whether substantial evidence supports it.

Our conclusion is that this evidence does not change the situation which confronts us. In other words, it leaves the Board's finding with sufficient evidence to sustain it.

II. *The Facts in Regard to the Patent Depreciation Item.* Petitioner owned the Burton patent, No. 1,049,667, which issued January 7, 1913, covering a process for cracking gasoline.

The fair market value of said patent as of March 1, 1913 (the effective date of the Federal income tax law) was $70,000,000.[18]

For the years 1918 to 1929, inclusive, petitioner annually made a deduction, for depreciation in value of the patent, of one-seventeenth (annual depreciation for full life of patent) of seventy million dollars. This deduction was $4,117,647.06. The patent, however, had already run fifty-nine days (January and February) of its life, when the Federal income tax act became effective, March 1, 1913. Therefore, there remained but 16 and 313/365 years of the patent life, on which basis the Commissioner figured the depreciation for seven days of January, 1930. On this basis of calculation the annual depreciation would have been $4,152,445.96.

Petitioner desires us to recoup for it the lower deduction which it took in the years when it deducted only one-seventeenth of $70,000,000 and increase its 1930 deduction by the difference in amount, which the difference in an accurate computation would produce.

■ The Government, on the other hand, contends, and we hold, that these tax years are now closed, and petitioner is in no position to claim the benefit of the new basis for calculating depreciation for these past years.

For the tax year 1930, the Commissioner concluded that petitioner was entitled to $67,687.33 depreciation (six days of patent life, or $\dfrac{1}{16\ 313/365}$ of $70,000,000). The Board, on a different theory of the duration of the life of a patent, held it had seven days to run in 1930. Using the same annual basic depreciation figure as the Commissioner, it concluded that $79,635.95 was properly deductible as depreciation for the year 1930. The Commissioner does not challenge the Board's holdings that the patent had seven instead of six days to run in 1930.

■ Petitioner contends for a depreciation deduction of $686,274.51—two months' deduction, because it has been denied two months' depreciation through all the prior years' calculations. We must reject this contention also. Petitioner made its income returns. It obtained the amount by it claimed as the correct deduction in value of this patent. (In passing, it is rather hard for us to believe that there was no fluctuation in the value of a patent covering a process for cracking gasoline during the eventful years of 1913 to 1930.) It made payment of its income tax on this basis. The Government accepted such sum in payment of petitioner's income taxes for said years. We are satisfied that it would be best for both parties to leave the door closed.

Support for the Board's holding is also found in Article 207 of the Regulations (75), which deals with the depreciation of a patent. It provides:

"Art. 207. *Depreciation of patent or copyright.*— In computing a depreciation allowance in the case of a patent or copyright, the capital sum to be replaced is the cost or other basis of the patent or copyright. The allowance should be computed by an apportionment of the cost or other basis of the patent or copyright over the life of the patent or copyright since its grant, or since its acquisition by the taxpayer, or since March 1, 1913, as the case may be. * * * The fact that depreciation has not been taken in prior years does not entitle the taxpayer to deduct in any taxable year a greater amount for depreciation than would otherwise be allowable."

Dispute over the fairness and practicability of this rule is hardly possible. It is sound accounting, and leads to more accurate and easier compilation of tax returns

---

[18] This amount is not our appraisal of its value. The parties stipulated and the Board found the value of this patent to be $70,000,000 on that date.

for both the Government and the taxpayer. It also has the effect of avoiding temptation to the taxpayer to choose the year in which he could offset permissible depreciation against unusual income, thereby diminishing surplus.

Petitioner finally contends that depreciation for a two months' period should be granted, on the theory that the "Burton patent" included both the U. S. patent and the Canadian patent, which seems to have run for a short period after the expiration of the U. S. patent. The Board concluded, however, correctly, so we think, that the stipulation of the parties fixing the value of the Burton process patent at $70,000,000 referred solely to the value of the U. S. patent, and its life therefore was the proper measuring stick for calculating depreciation.

The order of the Board of Tax Appeals is affirmed.