EDWARD H. PIETZ AND GLORIA PIETZ, ET. AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5854–70—5856–70.    Filed November 7, 1972.

---

[1] Cases of the following petitioners are consolidated herewith: Tod E. McClaskey and Maxine M. McClaskey, docket No. 5855–70; and Irven J. Harter and Margaret H. Harter. docket No. 5856–70.

*Frank E. McGee*, for the petitioners.
*Joseph M. Wetzel*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in the Federal income taxes of petitioners for the designated years in the following amounts:

| Docket No. | Year | Petitioner | Deficiency |
|---|---|---|---|
| 5854–70 | 1965 1966 | Edward H. Pietz and Gloria Pietz | $5,490.36 24,117.50 |
| 5855–70 | 1965 1966 | Tod E. McClaskey and Maxine M. McClaskey | 6,421.10 24,994.50 |
| 5856–70 | 1965 1966 | Irven J. Harter and Margaret H. Harter | 856.78 742.46 |

The cases were consolidated on a joint motion by all of the parties because of their common questions of law and fact. However, prior to trial several issues in dispute between petitioners and respondent were settled through negotiation. As a result of the settled issues, petitioners Irven J. Harter and Margaret H. Harter no longer have their tax liability for the years 1965 and 1966 in contention. The remaining matter presented for our determination concerns only petitioners Edward H. Pietz and Gloria Pietz, and Tod E. McClaskey and Maxine M. McClaskey. The question we are to decide is: Whether petitioners are entitled to an ordinary loss or a capital loss deduction for the amount of the adjusted bases in a now defunct partnership which they failed to recover at the termination of the partnership.

### FINDINGS OF FACT

Some of the facts are stipulated, and those facts, together with the exhibits attached thereto, are so found.

Petitioners Edward H. and Gloria Pietz are husband and wife and maintained their residence in Ridgefield, Wash., when they filed the petition herein. They filed joint Federal income tax returns for the taxable years 1965 and 1966 with the director of internal revenue for the district of Washington.

Petitioners Tod E. and Maxine M. McClaskey are husband and wife and maintained their residence in Vancouver, Wash., when they filed their petition herein. They filed joint Federal income tax returns for the taxable years 1965 and 1966 with the director of internal revenue for the district of Washington.

Since both Maxine M. McClaskey and Gloria Pietz were not active parties to the transactions in question, the designation "petitioners" will refer to Edward H. Pietz and Tod E. McClaskey unless specifically stated otherwise.

In October of 1964, Edward H. Pietz (sometimes hereinafter referred to as Pietz), Tod E. McClaskey (sometimes hereinafter referred to as McClaskey), and Harry and Cecile Grant (sometimes hereinafter referred to as the Grants) formed a partnership known as the Dunes Motel (sometimes hereinafter referred to as the partnership) for the purpose of building, furnishing, and operating a motel facility on leased land in Reno, Nev. Each of the partners had extensive experience in the motel business. The Grants had owned and operated a motel in Astoria, Oreg., which they had sold just prior to the Dunes venture. Pietz and McClaskey were business partners in several motel operations in Washington and Nevada.

The Dunes Motel partnership had a total capital contribution of $120,000. Each partner, Pietz, McClaskey, and the Grants, was credited with paid-in capital of $40,000.[2] The partnership profits and losses were to be shared equally among the three equal interests. Additionally, the Grants were to receive a small salary for managing the business.

At the inception of the Dunes venture, in October of 1964, an agreement was executed and signed by the partners and their wives. Pertinent parts of the agreement provided:

1. Heretofore Tod E. McClaskey and Maxine M. McClaskey, husband and wife, and Edward H. Pietz and Gloria Pietz, husband and wife, have made, entered into and executed an indenture of lease * * * covering * * * certain real property situated in the City of Reno, Washoe County, Nevada, for the purpose of constructing thereon a motel and said parties have obtained plans and specifications prepared by * * * an architect of Vancouver, Washington, covering the proposed motel.

2. All of the parties agree that a partnership agreement will be entered into between them whereby the Grants will contribute Forty Thousand Dollars ($40,000.00) to the capital of the partnership for the purpose of constructing and furnishing the proposed motel.

3. The McClaskeys and the Pietzes will contribute to the partnership all of the expenses which they have incurred in connection with the negotiation of the above-mentioned lease and will assign a one-third interest in the leasehold to the Grants.

4. The McClaskeys and the Pietzes as a part of their capital contribution to the partnership agree to construct upon the premises more particularly described in the lease forty-five (45) motel units together with the manager's unit at a cost which shall not exceed Seven Thousand Five Hundred Dollars ($7,500.00) per unit including the manager's unit and including all furnishings, but not including linen and supplies.

5. The Motel will be constructed in accordance with plans and specifications

---

[2] From the stipulations, the exhibits, and the testimony taken at trial, it is clear that the Grants paid in a $40,000 cash contribution at the formation of the partnership. However, it is not altogether clear how much of the $40,000 capital contributions of Pietz and McClaskey were made in cash and how much arose from personal services, development expenses, and capital assets, e.g., the ground lease of the property on which the motel was constructed, contributed by the two partners. Respondent has made no claim that the original capital contributions of these petitioners should not be recognized in those amounts.

\* \* \* which all of the parties have examined and heretofore approved. The total cost of the project including the swimming pool, landscaping, blacktopping and sprinkler system will be included in the guaranteed price of $7,500.00 per unit.

6. It is further understood that temporary and permanent financing will be arranged by the McClaskeys and the Pietzes in a maximum amount of Two Hundred Twenty Thousand and No/100 Dollars ($220,000.00), the proceeds of which loan will be used for construction and furnishing of the motel at a cost, however, not to exceed the limitation guaranteed by the McClaskeys and the Pietzes.

7. It is further understood and agreed that the Grants will devote their full time and efforts as resident managers of the motel and that they will be paid Five Hundred and No/100 ($500.00) Dollars per month for such services.

8. The parties agree that they will enter into an appropriate partnership agreement covering the operation of the partnership which partnership agreement shall provide that policies of the partnership shall be set by Tod E. McClaskey and Edward H. Pietz and that all of the net receipts from the operation of the business are to be applied on the loan and in reduction of the mortgage.

During 1964 and 1965 the Dunes Motel facility was constructed at a cost of $258,811.35 and furnished at an additional cost of $86,493.58.

To finance the motel construction, in accord with the terms of the initial partnership agreement, Pietz and McClaskey obtained $225,000 at 6-percent interest on a short-term loan by drawing on their personal line of credit at the Vancouver Branch of the Seattle First National Bank. Petitioners maintained and used this line of credit as a source of short-term financing for all of their motel operations, which included the Dunes Motel partnership.[3] The two petitioners, alone, signed the note for the $225,000, and there was no designation on the obligation as to petitioners' business relation, title of office, or authority to borrow the money. The initial loan was identified No. 20,646 by the bank and dated February 26, 1965.

Originally, the partners planned to refinance the $225,000 interim loan with a long-term loan as soon as possible after completion of the motel. However, McClaskey and Pietz were unable to find suitable permanent refinancing for the loan. Consequently, the line of credit advancement had to be renewed on June 1, 1965, by another note designated No. 20,987. The new obligation was for an amount of $228,562.50, which constituted principal of $225,000 and interest of $3,562.50. The second note was signed by only Pietz and McClaskey, with no designation thereon as to their business relation, title of office, or authority.

Payments were made on loan No. 20,987 on July 21, 1965, in the amount of $4,791.04, and on September 20, 1965, in the amount of $3,303.59. The two remittances were paid with checks drawn on the Dunes Motel bank account at First National Bank of Nevada, Reno,

---

[3] During 1965 there were more than 50 loan transactions on this line of credit totaling near $2 million and 66 repayment transactions totaling in excess of $1,900,000.

Nev. Both checks were signed by petitioner McClaskey and Harry Grant. The amounts tendered were to cover interest and to reduce the outstanding principal.

Eventually, petitioners were able to obtain a $165,000 long-term loan to partially fund their construction costs on a more permanent basis. They procured the loan from Standard Insurance Co. of Portland, Oreg. In respect of this borrowing, petitioners, with their wives, and the Grants signed a 7-percent note. On August 16, 1965, a real property deed of trust and a chattel mortgage on the Dunes Motel and its furnishings were executed by them in favor of Standard Insurance Co. of Portland, Oreg. The net proceeds of this loan, $163,267.35, were paid to Seattle First National Bank to decrease the amount due on the note designated as loan No. 20,987. That left a remaining balance on the June 1, 1965, note of $61,742.16.

On September 20, 1965, the $61,742.16 balance due on loan No. 20,987 was renewed by a note identified as loan No. 21,402. As in the case of the prior loans drawn on the petitioners' line of credit, the note again bore only petitioners' signatures. However, this note was marked "Reno Motel" by someone at the bank. Interest in the amount of $1,170.53 was paid on the note on December 27, 1965, by a check drawn on the Dunes Motel bank account and signed by McClaskey and Harry Grant.

Both the petitioners' line-of-credit obligation and the long-term loan from the insurance company were identified and reflected on the Dunes Motel partnership Federal income tax return for 1965. Attendantly, the two debts were recorded in the partnership's books and reflected on its financial statements.

Within 2 weeks of the initial opening of the Dunes Motel on March 1, 1965, it became apparent that the business would not be a profitable operation. The petitioners' supposition was confirmed by the fact that the motel operated at a $28,808.62 loss for the period March 1, 1965, through December 31, 1965. By early summer, both Pietz and McClaskey had decided to dispose of the motel. Their desire to extricate themselves from the business venture was reinforced when the partnership's accountant informed them that the motel was not generating enough revenue to meet its monthly business expenses. Thereafter, petitioners began looking for a purchaser to buy the business.

On the other hand, the Grants initially had mixed feelings about a hasty sale of the motel, though they also realized it was not operating successfully. More specifically, Cecile Grant was convinced that by a determined effort the business could be made a profitable one, while Harry Grant was willing to sell the business because of his poor health and the difficulties they experienced making enough

income to cover the loan payments. At one point, Pietz offered the Grants an interest in another motel in Elko, Nev., in exchange for their interest in the Dunes, but the Grants did not find this offer attractive and declined it.

By November of 1965 all of the partners readily acknowledged the undesirability of further efforts to save the profitless operation, and a sale of the motel was arranged. On January 4, 1966, the partnership sold the complete Dunes Motel operation, including the motel building, furnishings, equipment, and supplies, to four persons who are unrelated to any of the partners. Under the terms of the sale the buyers agreed to pay $60,000 in cash, to assume the balance of the $163,428.31 Standard Insurance Co. first mortgage, and to give the sellers a $106,571.69 note secured by a second deed of trust on the motel.

The buyers' offer was acceptable to all of the partners, but there was some disagreement among them as to the distribution of the sale proceeds. After negotiations between petitioners and the Grants, it was agreed that the $60,000 in cash would be paid directly from the escrow agent managing the transaction to the Seattle First National Bank to reduce the loan of approximately that amount drawn on petitioners' line of credit.[4] Attendantly, the $106,571.69 note secured by the second deed of trust was drawn solely in favor of the Grants and transferred directly to them from the escrow agent. Petitioners Pietz and McClaskey received no cash or other assets from the sale transaction. As a result of the sale, the partnership was stripped of all its assets and liabilities. Consequently, there were no distributions made directly from the partnership to any of the partners upon its termination shortly after the sale of the motel was finalized.

On the final partnership return of income for the year 1966, the partnership reported miscellaneous income of $857.10 and a loss of $60,552.40 on the sale of property other than capital assets, less a miscellaneous deduction of $40 resulting in a net loss of $59,735.30. This loss was allocated on Schedule K of the partnership return $29,867.65 to each of Pietz and McClaskey, no part of it being allocated to the Grants. Schedule M of the return, "Reconciliation of Partners' Capital Accounts," reflected the balances in the capital accounts of Pietz & McClaskey at the beginning of the year in the amount of $30,397.13 each, with a like amount being divided equally between the two Grants, ordinary losses in the accounts of Pietz and McClaskey in the amounts of $29,867.65 each, with no income or loss being reflected in the Grants' accounts, withdrawals, or distributions in the

---

[4] The outstanding balance due on the note at this point was actually $61,742.16. The $60,000 cash from the sale was insufficient to completely extinguish the debt by $1,742.16. That amount left outstanding was refinanced through a renewed drawing by Pietz and McClaskey on their line of credit. At this point it is unclear whether the partnership was still in existence.

amount of $529.48 for each of Pietz and McClaskey, and $15,198.56 for each of the Grants, all resulting in zero balances in the capital accounts of all four partners at the end of the period. Both Pietz and McClaskey claimed a loss of $29,867.65 from the Dunes Motel partnership on their individual income tax returns for the year 1966, which was offset in full in both returns by ordinary income from other partnerships.

In the notices of deficiency issued to both Pietz and McClaskey, respondent recomputed the gain or loss on the sale of the Dunes Motel to reflect a gain of $10,022.17 on the transaction which he determined to be ordinary income to the partnership under sections 1245 and 1250 of the Internal Revenue Code. The ordinary income of the partnership, as thus corrected, was allocated $3,613.09 to each of Pietz and McClaskey and $1,806.55 to each of the Grants. As a result of this adjustment, respondent added to the reported ordinary income of both Pietz and McClaskey $33,480.74 ($3,613.09 gain and $29,867.65 loss claimed). Respondent also determined that they both realized a long-term capital loss of $33,480.74 in 1966 from the distribution in liquidation of their partnership interest in the Dunes Motel (capital account at beginning of 1966 plus $3,613.09, less withdrawal=$33,480.74, less "Received in distribution for interest"—0). This capital loss was allowed as a deduction to the extent of $1,000 in 1966. The parties have stipulated that the partnership actually realized a gain on the sale in the amount of $10,022.17 as determined by respondent.

At trial there was some disagreement between the parties as to whether the explanation of the adjustments with respect to the Dunes Motel in the notice of deficiency properly informed petitioners of the basis for respondent's determination of those adjustments.

OPINION

At trial and on brief petitioners raised a preliminary issue with their allegation that the statutory notices of deficiency did not state with requisite clarity the grounds upon which respondent determined their deficiencies. They argue that they were not properly apprised of the issue raised because respondent's disclosures in the notices correctly explaining the basis for his deficiency determinations as resulting from the Dunes Motel partnership liquidation were followed by inconsistent statements in the accompanying computation sheets (computation of capital loss on partnership liquidation) that petitioners received nothing in the liquidation. Relying on *Sheldon Tauber*, 24 T.C. 179 (1955), they contend the burden of proof in this case has been shifted from the taxpayers to the Commissioner as a result of his ambiguous explanations.

Petitioners' argument is without merit. The essential purpose of a

deficiency notice is to provide a formal notification that a deficiency in taxes has been determined. *Standard Oil Co.*, 43 B.T.A. 973 (1941), affd. 129 F. 2d 363 (C.A. 7, 1942). Here the notices made it clear that respondent determined petitioners had "realized a long-term capital loss of $33,480.74 in 1966 from the distribution in liquidation of * * * [their] partnership in the Dunes Motel." Respondent clearly stated the amounts of their tax deficiencies and the years to which they were attributable. Petitioners' arguments at trial and on brief convince us that they were well informed on the amounts of the deficiencies and the respondent's grounds for his determinations. Furthermore, the presence of inconsistencies in the computation statement, alone, did not invalidate the respondent's determinations. *Manuel D. Mayerson*, 47 T.C. 340 (1966); *Jacob F. Brown*, 18 B.T.A. 859 (1930), reversed on other grounds 54 F. 2d 563 (C.A. 1, 1931), certiorari denied 286 U.S. 556 (1932). Consequently, we hold that the notices of deficiency were sufficient to put the claimed ordinary-loss deductions at issue, and petitioners have the burden of proof with respect to the issue presented.

The primary unresolved issue upon which this case is built concerns the nature of petitioners' losses from their investment in the Dunes Motel partnership. There is no dispute as to the existence of the losses or the amount of the losses arising from their unsuccessful business experience. The disagreement arises from respondent's determination that the losses should be characterized as capital losses, while the petitioners vigorously argue their right to ordinary-loss deductions.

Respondent bases his capital-loss determination on the interplay between section 752(b),[7] section 731(a)(2),[8] and section 741.[9] He

---

[7] All statutory references are to the 1954 Code unless otherwise stated.

SEC. 752(b). DECREASE IN PARTNER'S LIABILITIES.—Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

[8] SEC. 731. EXTENT OF RECOGNITION OF GAIN OR LOSS ON DISTRIBUTION.

(a) PARTNERS.—In the case of a distribution by a partnership to a partner—

*   *   *   *   *   *   *

(2). loss shall not be recognized to such partner, except that upon a distribution in liquidation of a partner's interest in a partnership where no property other than that described in subparagraph (A) or (B) is distributed to such partner, loss shall be recognized to the extent of the excess of the adjusted basis of such partner's interest in the partnership over the sum of—

(A) any money distributed, and

(B) * * *

Any gain or loss recognized under this subsection shall be considered as gain or loss from the sale or exchange of the partnership interest of the distributee partner.

[9] SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE.

In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value).

argues first that the $61,742.16 loan outstanding at the Seattle First National Bank on January 10, 1966, was a personal obligation of both Pietz and McClaskey, and that when $60,000 of the sales price of the Dunes Motel was applied to reduce that liability, the petitioners, in effect, received a "distribution of money" within the meaning of section 752(b), that this was a distribution in liquidation of petitioners' interests in the partnership which resulted in a recognizable loss, but only as a loss on the sale or exchange of their partnership interests under section 731(a), and that such loss shall be considered a loss from the sale or exchange of a capital asset under section 741. In other words, respondent contends that on the sale of the Dunes Motel and attendant liquidation of the partnership, petitioners received a $60,000 cash liquidation distribution, in the form of a payment on their outstanding debts. Since the $60,000 was the entire amount they received for their interests in the partnership, the $33,480.74 loss each experienced as a result of his failure to recoup his adjusted basis in the partnership should be characterized as a capital loss under the provisions of section 731(a)(2) and section 741.[10]

Respondent has enhanced the persuasiveness of his position with the alternative argument that if we find the $61,742.16 loan to be an obligation of the partnership and not petitioners' personal debt, the characterization of their losses should, nevertheless, be the same. This premise, he maintains, is based on the applicable law that partnership debts are the joint liability of the partners. Thus, in a liquidation situation, the satisfaction of an ordinary partnership liability by the partnership relieves the individual partners of what each would have had to pay if, after the termination of the partnership, the debt had remained unpaid. This means, in short, that if the partnership repays its own debt as one of its liquidating transactions, the payment will be deemed a money distribution to each partner for the amount of his respective share of the debt, along with any other distributions he might receive. Such a constructive distribution under section 752(b) is essential, respondent argues, to keep the tax results of a partnership liquidation in line with the economic realities.[11]

Petitioners' characterization of the transactions in question and their resulting tax consequences is almost entirely irrelevant to re-

[10] We have no way of determining what adjustments, if any, respondent made in petitioners' basis to reflect the original liability incurred, sec. 752(a), but the parties have agreed on the amount of the loss as computed by respondent.

[11] We understand respondent's argument to imply that the recognition of the constructive distribution is important for *characterization* purposes only since each partner's share of the partnership debt is adequately reflected in his partnership basis. Thus, respondent appears to contend that the constructive distribution will not alter the amount of the taxpayer's actual loss on liquidation of the partnership, but will effect only characterization of the loss. It is not clear whether respondent's position is that subch. K denies taxpayers ordinary losses on all liquidations of partnership, or whether they are denied ordinary losses only where the liquidation proceeding involves the satisfaction of existing partnership debts.

spondent's position. They first claim that the indebtedness to the bank was a partnership debt rather than their own personal liability. They would then have us treat the sale of the Dunes Motel and application of the proceeds of sale to payment of the debt as a separate transaction from the liquidation of the Dunes Motel partnership. Consequently, they claim they received nothing in the form of a distribution from the partnership in liquidation or otherwise and hence none of the sections of subchapter K come into play. They claim they did not sell or exchange their partnership interests but simply abandoned their investments in the partnership and are therefore entitled to ordinary-loss deductions under section 165.[12] They cite in support of their claim *Palmer Hutcheson*, 17 T.C. 14 (1951), and *Gaius G. Gannon*, 16 T.C. 1134 (1951).

Based on the evidence presented, our analysis of what happened is as follows. Petitioners and the Grants entered into a partnership to construct and operate the Dunes Motel. The cost of construction and furnishings was not to exceed $337,500 (45 units of $7,500 each). Each of the petitioners and the Grants between them were to put up $40,000 capital and the balance of the construction funds were to be arranged for by petitioners. Petitioners used their own line of credit at the Seattle First National Bank for the construction loan of $225,000, signing a note as evidence thereof. Petitioners were able to raise only $165,000 in the form of permanent financing on a note secured by a first deed of trust on the property to Standard Insurance Co. of Portland. The proceeds of the permanent loan were applied on the construction loan, leaving a balance still owing of $61,742.16. The bank officers certainly knew what the proceeds of the loan had been used for and could probably have collected the balance from the partnership (and ultimately the partners) under local law if necessary, see Wash. Rev. Code, secs. 25.04.010, *et seq.*, and Nev. Rev. Stat., secs. 87.010, *et seq.; Vancouver Nat. Bank* v. *Katz*, 142 Wash. 306, 252 Pac. 934 (1927) ; *Refrigeration Engineering Co.* v. *McKay*, 4 Wash. App. 963, 486 P. 2d 304 (1971) ; but this would not relieve petitioners of personal liability on the note to the bank which they alone had signed.

When it became apparent soon after construction was completed that the venture would not succeed, petitioners wanted out and were willing

---

[12] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

* * * * * * *

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *

to take whatever loss was necessary in order to get out, even if it meant letting the Grants take more than their share of anything left to accomplish this. Petitioners were primarily interested in not incurring any loss in addition to their initial investments [13] so when purchasers were found who would assume liability on the first mortgage and pay $60,000 cash to cover most of the liability to the bank, they were assured of accomplishing most of this objective. However, petitioners were also interested in salvaging whatever else was available.

Obviously, given the capital gain or loss mandate of sections 731 and 741, an ordinary loss for abandonment under section 165 would be more valuable to petitioners, who were high-bracket taxpayers, taxwise. Having all the cash applied to the bank liability and having the second mortgage, for whatever it was worth, made out to the Grants with petitioners taking nothing upon liquidation of the partnership, offered a tempting possibility of achieving this objective. There is no evidence of the value of the second mortgage but in the partnership return for 1966 there appears to have been attributed to the second mortgage a value equal to the balances in the Grants' partnership capital accounts (approximately $30,000) and reflects withdrawals by them in those amounts so their capital accounts were reduced to zero. Had the accounting been handled as it should have been under the partnership agreement the remaining assets of the partnership (which apparently consisted only of the second mortgage received from the purchasers) should have been distributed to all the partners in accordance with their respective interests and the value of those interests should have been credited to their capital accounts. Had this been done and had the second mortgage been valued at face value ($106,000) petitioners would have had no loss on their investment to claim as a deduction but would have continued to have an interest in the Dunes Motel venture in the form of an interest in the second mortgage on the property.

We believe and find that the sale of the motel and the application of the proceeds to payment of the indebtedness to the bank, with the second mortgage being distributed to the Grants, was an integral part of the plan agreed upon by the partners to liquidate and terminate the unsuccessful partnership venture in a manner that would satisfy all the partners and be in their best interests; and that payment of the debt to the bank was a part of the liquidation process agreed upon.

While the parties place considerable emphasis on whether the $60,000 liability to the bank was a partnership liability or a liability of the petitioners individually, we do not believe it makes much dif-

---

[13] It is not clear from the record in what form petitioners made their initial capital investments. See fn. 2.

ference in the end result, under the particular circumstances of this case, and we have made no effort to answer that question specifically.[14] If it was a liability of the petitioners individually it would appear that through the interplay of sections 752(b), 731, and 741, the payment of that liability by the partnership would be considered a distribution of money to petitioners in liquidation and any loss recognized would be considered a loss from the sale or exchange of their partnership interests. This would make the cases relied on by petitioners inapplicable.

On the other hand, if the liability was that of the partnership, the payment of that liability by the partnership would result in a decrease in each of the partners' share of the liabilities of the partnership and would be considered as a distribution of money to the partners by the partnership under section 752(b). This being a distribution in liquidation of the petitioners' interest in the partnership, and being considered a distribution of money, loss would be recognized to the petitioners under section 731(a)(2) but it would be considered a loss from the sale or exchange of the partnership interests of the petitioners under section 731(a). This would bring into play section 741 and the loss would be considered as a loss from the sale or exchange of a capital asset, resulting in a capital loss. See *Andrew O. Stilwell*, 46 T.C. 247 (1966); *Stackhouse* v. *United States*, 441 F. 2d 465 (C.A. 5, 1971). While those two cases differ somewhat factually from this case they both stand for the proposition that the provisions of subchapter K of the 1954 Code are not to be ignored under circumstances such as are here involved and that the provisions of sections 752(b), 731(a), and 741 must be read together to determine the character of gains and losses incurred in liquidating a partnership where liabilities of the partners and/or the partnership are paid as a part of the liquidation process. We do not agree with petitioners that section 752(b) is limited in application to determining adjustments that are to be made in the partners' capital accounts when liabilities are paid.

Petitioners rely primarily on two cases decided by this Court before subchapter K was enacted, *Palmer Hutcheson*, supra, and *Gaius G. Gannon*, supra, and would have us ignore subchapter K on the theory that none of the provisions of subchapter K are applicable here or would serve to abrogate the conclusions reached in those cases. In those two cases the petitioners were both partners in the

---

[14] The circumstances tend to support respondent's contention that the bank liability was or became the personal liability of petitioners; at least petitioners recognized that upon termination and liquidation of the partnership they would be personally liable on the debt to the bank. Petitioners apparently accepted liability for the balance of the indebtedness in the amount of $1,742.16. It also appears that they attributed a value of about $30,000 to the second mortgage received on the sale. The mortgage was distributed to the Grants, whereas the $60,000 cash was used to reduce the liabilities of the two petitioners $30,000 each. This would result in an equal distribution in liquidation of the partnership interests, if the debt to the bank was considered to be the personal liabilities of petitioners; otherwise the distribution was weighted heavily in favor of the Grants.

same law firm who withdrew from the partnership. The partnership agreement provided that upon the voluntary withdrawal of a partner from the firm who remained in the active practice of law, no compensation would be paid for his interest in the firm. The withdrawing partners claimed ordinary losses for their investments in the firm. This Court concluded that upon withdrawal the petitioners forfeited their investments in the firm and therefore sustained losses deductible under section 23(e), I.R.C. 1939,[15] unless the loss was occasioned by the "sale or exchange" of their partnership interests, which were recognized as capital assets. Finding that no "sale or exchange" of the partnership interests occurred, see also *Andrew O. Stilwell, supra,* the Court found that petitioners' losses were not limited by the capital gains provisions of the Code.

There are two vital distinctions in the two cases relied upon by petitioners, which make them inapposite here. First, there were no liabilities of either the partners or the partnership that were paid off or assumed, and hence they received nothing that could be considered distributions even under subchapter K. Second, there were no provisions in the 1939 Code, applicable to those transactions, which provided that a decrease in the partners' or partnership liabilities would "be considered as a distribution of money to the partner by the partnership," sec. 752(b), 1954 Code, and that upon a distribution of money in liquidation of a partner's interest in a partnership loss shall be recognized to a limited extent but such loss "shall be considered as * * * loss from the sale or exchange of the partnership interest," sec. 731(a), 1954 Code, and that "In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized" but "Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset," sec. 741, 1954 Code.

We might add that we cannot find here that petitioners "forfeited" their investment in the partnership, as we found in the cases discussed above. There was no provision in their partnership arrangements that required them to forfeit their investments or interests as was the situation in those cases. The circumstances dictated the arrangements here. We believe petitioners made an agreement with the Grants for the sale of the property and application of the proceeds in liquidation of the partnership which gave them what they wanted most and was the most they could expect to receive under the circumstances. This was a capital transaction and resulted in a capital loss for tax purposes. See *Miller* v. *United States,* 331 F. 2d 854 (Ct. Cl. 1964), and *Wilkinson* v. *United States,* 177 F. Supp. 101 (S.D. Ala. 1959).

We hold for respondent on this issue.

*Decisions will be entered under Rule 50.*

---

[15] Comparable to sec. 165 of the 1954 Code.