MANUEL D. MAYERSON AND RHODA MAYERSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2969-64. Filed December 29, 1966.

*Mark H. Berliant,* for the petitioners.
*Conley G. Wilkerson,* for the respondent.

HOYT, *Judge:* Respondent determined deficiencies of $11,018.48 and $22,312.75 in joint income taxes of petitioners for 1960 and 1961, respectively. Certain issues have been settled between the parties. A preliminary issue is whether the statutory notice of deficiency constitutes a determination which places the burden of proof to show error in the determination upon the petitioners. The principal issue remaining is whether petitioners are entitled to depreciation deductions on a business property located at 8th and Walnut in Cincinnati, Ohio, and, if not, what is the proper amortization period for $10,000 in payments made in connection with the acquisition of that building. A subsidiary issue is whether petitioners erroneously computed the deduction claimed for depreciation with respect to other income property on Forest Avenue. A portion of this depreciation deduction was disallowed.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly and adopted as our findings.

Petitioners are husband and wife and are residents of Cincinnati, Ohio. Their joint returns for the years involved were filed with the district director of internal revenue, Cincinnati, Ohio. Petitioner, Rhoda Mayerson, is a party herein only by reason of having filed a joint return with her husband, Manuel D. Mayerson, and the latter will hereinafter be referred to as the petitioner.

Petitioner has been a licensed real estate broker for approximately 20 years. In addition to his brokerage activities, he has owned many investments in real estate and has been instrumental in developing several shopping centers and many motel and apartment projects, remodeling older structures when necessary.

The property which is the subject of the primary controversy here is located at the northwest corner of 8th and Walnut Streets, Cincinnati, Ohio, and hereinafter will be referred to as the 8th and Walnut Building. Petitioner first became interested in acquiring this commercial property in the latter part of 1959. The building was owned by the Estate of Edith W. Balch and petitioner contacted the coexecutor of the estate, Henry W. Hobson, Jr., a Cincinnati lawyer, to discuss the possible sale of the building. At the outset petitioner was informed that the estate wanted $275,000 cash for the property and that if he was not able to pay cash the price would go up to a top price of $332,000.

The history of the building relative to its net profits over the years was discussed in detail during the sales negotiations. At one time the building had produced a relatively good income but toward the last years of Edith Balch's life and during the period of administration of the Balch Estate the building had not been profitable.

Another concern of petitioner was the existence of 72 outstanding building orders against the building imposed by municipal authorities in order to insure conformance with the Cincinnati Building Code. Petitioner considered these building orders carefully since the exact costs for necessary corrective action could not be precisely ascertained, and they could have involved tens of thousands of dollars.

Petitioner was only interested in the purchase of the 8th and Walnut Building and the Balch Estate was only interested in selling the building. The Balch Estate was not interested in leasing the property to petitioner or obtaining a new manager.

Petitioner was particularly interested in remodeling this older property in order to enhance its profit potential. Several alternative possibilities for the building were discussed, including conversion into a

motel or hotel, development into a downtown apartment project or a major garage installation, or attraction of a single user for the entire property.

Petitioner's lack of available funds made it impossible for him to pay cash for the building. Conventional mortgage financing was investigated but it was found that such financing was unavailable due to the building's age, condition, and the outstanding building orders. After extensive negotiations, representatives of the Balch Estate agreed to convey the title to the building with financing based upon a purchase-money note in the face amount of $332,500 secured by a long-term mortgage. If the purchase-money obligation was paid off within the first year, or the 2 succeeding years, the price would be reduced to $275,000 or $298,750, respectively. Thereafter, the price would increase to the face amount of the mortgage note, a maximum of $332,500.

A valid warranty deed was executed and the property was conveyed to petitioner on December 31, 1959. The deed was presented to the Hamilton County, Ohio, county auditor on December 31, 1959, where it was noted for transfer, and the formal registration with the recorder of Hamilton County, Ohio, was completed on January 5, 1960.

In connection with the transaction, petitioner on the same date executed and delivered to the sellers documents entitled "Mortgage Note" and "Purchase Money Real Estate Mortgage." The document entitled "Mortgage Note" provided as follows:

FOR VALUE RECEIVED, on or before ninety-nine (99) years from date, the undersigned, Manuel D. Mayerson, Trustee, promises to pay to the order of DeWitt W. Balch and Henry W. Hobson, Jr., Co-Executors of the Estate of Edith W. Balch, deceased, their successors or assigns, whose present address is 1232 Federal Reserve Bank Building, Cincinnati 2, Ohio, the principal sum of Three Hundred Thirty-two Thousand Five Hundred Dollars ($332,500.00), under the conditions contained herein and subject to the limit of liability as provided for herein; Five Thousand Dollars ($5,000.00) of principal shall be payable on December 31, 1959, and Five Thousand Dollars ($5,000.00) of principal shall be payable on January 4, 1960. There shall be no obligation on the maker to make any further payments of principal at any particular time prior to due date, but he shall have the privilege of making payments, but shall not be obligated to, on account of principal at any interest payment date as hereinafter provided, but any such principal payment shall not be in an amount of less than Twenty-five Thousand Dollars ($25,000.00).

Interest shall be the sum of Eighteen Thousand Dollars ($18,000.00) per year, payable in monthly installments of Fifteen Hundred Dollars ($1500.00) each on the last day of each month, beginning January 31, 1960. When and if the principal owing on this note shall have been reduced below the sum of Three Hundred Thousand Dollars ($300,000.00), interest on the remaining balance shall be calculated at the rate of 6% per annum on the unpaid principal, and shall be payable in equal monthly installments monthly at the times hereinbefore stated.

It is further agreed that if the two payments aggregating Ten Thousand Dollars ($10,000.00), payable on December 31, 1959 and January 4, 1960, as

aforeprovided, and all interest shall have been paid, the principal amount of this note may be fully satisfied at any time after January 5, 1960, and before December 31, 1960, by the payment of Two Hundred Seventy-five Thousand Dollars ($275,000.00), the said Two Hundred Seventy-five Thousand Dollars ($275,-000.00) to be reduced by any payments that may have been made in addition to the Ten Thousand Dollars ($10,000.00) paid on December 31, 1959, and January 4, 1960, and upon such payment this note shall be cancelled.

It is further agreed that if the two payments aggregating Ten Thousand Dollars ($10,000.00), payable on December 31, 1959 and January 4, 1960, as aforeprovided, and all interest shall have been paid as herein provided, the principal amount of this note may be fully satisfied at any time after December 31, 1960, and before December 31, 1962, by the payment of Two Hundred Ninety-eight Thousand Seven Hundred and Fifty Dollars ($298,750.00), the said Two Hundred Ninety-eight Thousand Seven Hundred and Fifty Dollars ($298,750.00) to be reduced by any payments that may have been made in addition to the Ten Thousand Dollars ($10,000.00) paid on December 31, 1959, and January 4, 1960, and upon such payment this note shall be cancelled.

This note is secured by a mortgage of even date herewith on real estate situate in Cincinnati, Ohio.

In the event of default in the payment of any installment of principal or interest on this note when due, or in the event of default in the performance of any of the covenants contained in the mortgage to be performed by the mortgagor, the holder of this note may, at his option, without notice, declare the principal of this note and the interest thereon to be immediately due and payable and may proceed to enforce the collection thereof by suit to foreclose the mortgage, but his sole recourse, except for interest then due, shall be to the mortgaged property and the maker's liability for any other amounts owing hereunder, shall be limited to the loss of the real estate covered by the mortgage and there shall be no personal liability whatever on his part. The holder, by acceptance hereof, waives the right to bring an action or suit for personal judgment hereon, except for accrued interest.

The pertinent provisions of the document entitled "Purchase Money Real Estate Mortgage" provided as follows:

And the said Grantor, for himself and his successors in trust and assigns, does hereby covenant and agree with the said Grantees, their successors and assigns, as follows:

1. To pay the note hereby secured in accordance with its terms, but subject however, to the limit of liability therein and herein provided, and all other amounts herein agreed to be paid by the Grantor when and as the same shall become due under any covenant or stipulation herein contained, subject, however, to limit of liability herein contained.

*　　　*　　　*　　　*　　　*　　　*　　　*

In the event of loss, if permitted by Grantees' mortgagee, the proceeds of the foregoing insurance policies shall be applied at the option of the Grantor either to the reduction of the mortgage indebtedness secured hereby or to the repair and restoration of the damage. Should it be applied to such repair and restoration and there be an overage, the overage shall be applied to the reduction of the mortgage indebtedness. It is further agreed, if permitted by Grantees' mortgagee, that if the damage be of such nature as in the opinion of the Grantor shall not warrant the application of the proceeds to the construction of a building similar to that now on the premises, the Grantor may demolish whatever is left of the present structure and either replace it with a different type of struc-

ture or none at all, provided, however, that such action shall not be taken without the consent of the Grantees, which consent shall not be unreasonably withheld. If such course is taken, proceeds of insurance shall be used to place the property in proper condition and the balance shall be applied to the reduction of the mortgage indebtedness.

4. To maintain or cause to be maintained the buildings and improvements upon said premises in good condition and to repair, renew and replace the same whenever necessary and not to commit or permit any waste thereon or thereof.

5. To improve the mortgaged property by complying with all building orders outstanding against the property as of the date hereof with due diligence and within a reasonable time and, thereafter, to keep the property free of any building orders by any public or other authority authorized to issue the same by complying therewith with due diligence and within a reasonable time.

* * * * * * *

7. That upon failure of Grantor to maintain insurance as above stipulated or to deliver said renewal policies as aforesaid or to pay said premiums, the Grantees may effect such insurance and pay the premiums therefor, and upon Grantor's failure to pay any taxes, charges, rates and assessments as above stipulated or if there shall be at any time any prior liens or encumbrances on said premises, Grantees may, without notice to or demand on Grantor, pay the amount of any such taxes, charges, rates or assessments or prior liens or encumbrances and redeem the property from any tax sale with any expenses attending the same, including Attorneys' fees. In either of such events, the Grantor agrees to repay to the Grantees, with interest at the rate of six per cent (6%) per annum thereon, upon demand, any amount so paid by the Grantees, and the same shall be a lien on said premises and be secured by these presents.

8. The Grantor will comply with all laws, ordinances and regulations of all public authorities relating to the Mortgaged Premises and will not remove or demolish any buildings thereon or any of the mortgaged properties situated therein without the consent of the Grantees, which consent shall not be unreasonably withheld; nor shall Grantor sell or convey any part of the premises hereby conveyed without the written consent of Grantees, which shall not be unreasonably withheld. The foregoing limitation of conveyancing shall not be applicable to conveyances to any person for whom the Grantor is holding title and all limitations of liability provided for herein shall have like application to the Grantor and any persons for whom the Grantor holds title.

9. That the Grantor will pay to the Grantees any and all sums, including costs, expenses, reasonable Attorneys' fees, which Grantees may incur or expend in any proceeding to sustain the lien of this mortgage or its priority (except for mortgage hereinafter referred to) or to defend against the liens or claims of any person or persons asserting priority to this mortgage (except for mortgage hereinafter referred to) or in discharge of any such claim or lien or in connection with any suit at law or in equity to foreclose this instrument or to recover any indebtedness hereby secured or in which it may be necessary or proper to prove the amount thereof or for any extension of title to said premises together with interest on said sums at six per cent (6%) per annum until paid and any amounts so paid by the Grantees shall be a lien on said premises and be secured by these presents.

* * * * * * *

Notwithstanding anything in this mortgage or in the promissory note contained to the contrary, the sole and only personal liability of the Grantor shall be the obligation to make the two payments on December 31, 1959, and January 4, 1960, aggregating ten thousand dollars ($10,000.00), and the payments to Grantees provided for in Paragraphs 7 and 9 above and the interest provided

for in the promissory note, and the Grantees' only recourse in case of any default in any other of Grantor's obligations shall be against the mortgaged property only, and to foreclose the mortgage and in no event and under no circumstances, except as provided in this paragraph, shall a money judgment be taken against Grantor. It is further agreed and understood that Grantor's obligations under Paragraphs 7 and 9 and for interest on said note shall terminate, except as to amounts then due, upon the first to happen of the following: (1) Proceedings being commenced to foreclose this mortgage or to otherwise regain possession of the mortgaged property, or for the application of rents for the benefit of the mortgagees; or (2) upon proffer of a conveyance thereof to the Grantees by the Grantor, except for sums for costs, expenses and reasonable attorneys' fees, which may accrue thereafter by reason of a proceeding described in Paragraph 9. Grantees hereby waive the right to bring or maintain any action or suit for a personal judgment, except as provided in this Paragraph.

Both of the preceding documents will hereinafter be referred to jointly as the purchase-money mortgage.

Petitioner paid $5,000 in December of 1959 and $5,000 in January of 1960 as provided for and required by the note. It was understood by the parties that petitioner would find the best use for the property as soon as possible and after finding such use seek conventional financing for the purpose of liquidating the purchase-money mortgage. The time for accomplishing the foregoing plan was indefinite, but the parties discussed the possibility of 5 to 10 years or less.

Petitioner held title to the building as trustee. An unrecorded trust agreement named his wife as the beneficiary of the trust. Under Ohio law, such an arrangement is categorized as a dry trust and subsequent purchasers are entitled to consider the trustee as the sole owner of the property.

Following the transfer of title, petitioner contacted architects and had engineering surveys made of the property. Costs of conversion were explored with several independent contractors. Apartment or motel conversions were investigated in detail. Petitioner spoke to hundreds of people in connection with the possible conversion of the building. Installation of new elevators was considered as well as refacing the entire structure.

The outstanding building orders were reduced from 72 to 25 by March 4, 1960, and were further reduced to 6 by December 16, 1964. This was done by petitioner at his expense in order to keep the building open and also to comply with the requirements of the purchase-money mortgage. Boilers were purchased by petitioner and installed in the 8th and Walnut Building in January of 1961 at a cost of $13,000.

In addition to repairs required by the building orders and normal maintenance, petitioner has made several major improvements. Garage entrances were widened, the building was rewired, the lobbies were reconditioned with the installation of new ceilings and fronts. Several thousands of dollars were spent to create offices on the second

floor of the building as part of an experiment to test the potential for renting office space at highly competitive rates. Costs of repairs to the building in the amount of $9,847.67 and $8,931.11 were deducted on petitioner's income tax returns for 1960 and 1961, respectively, and these deductions have not been questioned by respondent or disallowed in the deficiency notices issued for those years.

Following the transfer of title in 1959, petitioner executed leases with tenants and paid utilities, insurance, and real estate tax bills. In late December of 1964, petitioner learned that the owner of a nearby building was contemplating another area for a garage. After discussions with the owner of this building, petitioner convinced him to lease the entire 8th and Walnut Building. By using this lease as collateral, petitioner was for the first time able to get a conventional mortgage loan from a financial institution. After securing this loan, petitioner negotiated with the Balch Estate and in January of 1965 the parties agreed to a settlement to discharge the note and purchase-money mortgage by the payment of the flat sum of $200,000. Petitioner made no payment of principal with respect to the purchase-money mortgage from the time of the initial $10,000 downpayments until the negotiated settlement resulting in payment of $200,000 to discharge this lien.

Petitioner had never dealt with Henry W. Hobson, Jr., the co-executor of the Balch Estate, prior to the negotiations concerning the 8th and Walnut Building. The two men were not even acquainted with each other prior to these dealings. Neither the Balch Estate nor the trust which succeeded to its interest claimed a deduction for depreciation on the building after December 1959.

A deed from petitioner as trustee would be necessary to transfer legal title to the 8th and Walnut Building to any person or entity. A title insurance company was willing in December of 1964 to issue a title insurance binder in support of such a conveyance in any amount desired.

In the field of mortgage lending, it is a usual practice with respect to income-producing property that mortgagors have their liability limited to the specific security that is covered by the mortgage. It is also a frequent practice in the field of mortgage lending to allow the mortgagee to waive payments of principal on income-producing properties in distress or incentive situations.

Petitioner allocated $200,000 of the alleged purchase price of the 8th and Walnut property to the depreciable building and claimed depreciation during the years in question based upon this amount. By a 30-day letter dated September 26, 1963, petitioner was advised that the Internal Revenue Service was disallowing all depreciation on the 8th and Walnut Building for the following reason:

The disallowance of depreciation in full on 8th and Walnut was based on the fact that the transaction made by the taxpayer in obtaining the building was a lease and not a purchase. The taxpayer's down payment of $10,000 was determined to be cost of obtaining the lease and amortizable over the life which is 99 years.

The statutory notice of deficiency dated April 9, 1964, contained the following determination for 1960:

It has been determined that depreciation claimed [in] the amount of $18,025.00 is excessive, and not an allowable deduction in accordance with section 167 of the Internal Revenue Code of 1954. See Exhibit A for computation of the adjustments.

You are hereby allowed amortization on the $10,000.00 cost of obtaining lease on 8th and Walnut Building, in accordance with section 178 of the Internal Revenue Code of 1954. See Exhibit A for computation of the adjustment.

The determinations for 1961 relating to depreciation on the 8th and Walnut Building contained in the same notice of deficiency were identical in all respects except for the amount disallowed. Exhibit A to the notice of deficiency showed that no depreciation attributable to the 8th and Walnut Building was allowable, but allowed an annual deduction of $101.01 as amortization over a period of 99 years for the $10,000 downpayment which was classified as the cost of obtaining a 99-year lease. The notice of deficiency did not alter petitioner's claimed interest deductions for the years 1960 and 1961 relative to the purchase-money mortgage, and did not provide for or allow any deductions for rental payments under a lease.

The parties have agreed that if it is determined that petitioner is entitled to claim depreciation with respect to the 8th and Walnut Building, then, for the purpose of determining the depreciation deduction the following shall apply:

| | |
|---|---|
| Allocation of investment in entire property | 60.15 percent building. |
| | 39.85 percent land. |
| Method of depreciation | 150 percent declining balance. |
| Useful life | 25 years. |

Exhibit A to the notice of deficiency also shows a reduction in the amount of depreciation allowable on another building owned by petitioner which was located at 633 Forest Avenue. No specific explanation for this adjustment was set forth in the notice of deficiency. Respondent's position with respect to the Forest Avenue property was clarified at trial. It was stated by counsel for respondent that claimed depreciation was adjusted to remove from basis the cost of a boiler which had been deducted as an expense in a year prior to the years in question. Petitioner introduced no evidence concerning this adjustment.

There was no contention on the part of petitioner that he was taken by surprise or that he was unprepared to proceed to trial with respect to the positions stated by respondent in his opening statement.

### ULTIMATE FINDINGS OF FACTS

The petitioner acquired the 8th and Walnut Building in an arm's-length transaction which constituted a bona fide purchase and created a valid debt obligation. Petitioner's gross investment in this property for computing depreciation for the years 1960 and 1961 was $332,500.

### OPINION

Petitioner contends that the statutory notice of deficiency is so vague and indefinite that it did not constitute a determination, and that therefore no burden of proof is placed upon him. The primary basis for this contention is that the deficiency notice did not disclose respondent's reasons for his disallowance of the depreciation deductions in question.

Although section 6212(a) of the Code [1] provides for the issuance of a notice of deficiency, there is no provision in the Code which specifies the proper form and contents of the notice. The notice of deficiency in question made it clear that claimed depreciation in stated amounts and with respect to identified properties had been disallowed under provisions of section 167. The notice of deficiency informed the taxpayer that deficiencies had been determined and the years to which they were applicable.

Petitioner refers to Exhibit A to the notice of deficiency, which shows the computation of the determined deficiencies, and makes reference to certain alleged errors, inconsistencies, and lack of explanation in support of his contention that the notice of deficiency does not constitute a determination. We hold that the notice of deficiency was sufficient to put the claimed depreciation deductions in issue, and petitioner has the burden of proof with respect to the issues presented.

The presence of inconsistencies in the computation statement does not invalidate the determination. In *Jacob F. Brown*, 18 B.T.A. 859, 867 (1930), reversed on other grounds 54 F. 2d 563 (C.A. 1, 1931), certiorari denied 286 U.S. 556 (1932), the following statement appeared:

This is an attempt to create a false issue. The Board's function is to determine upon evidence of facts whether the deficiency is as determined by respondent. The presumption is with the respondent and the burden of proof by evidence of facts is upon the petitioner who attacks it. The respondent's result may be correct, as it is presumed to be, notwithstanding incorrect factors of computation or incorrect methods or hypotheses in arriving at such result. * * *

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise stated.

The essential purpose of a deficiency notice is to provide a formal notification that a deficiency in taxes has been determined. This position was elaborated upon in *Standard Oil Co.*, 43 B.T.A. 973, 998 (1941), affd. 129 F. 2d 363 (C.A. 7, 1942):

The respondent correctly argues in his brief that "Deductions may be disallowed by the Commissioner without assigning any reason or theory for his action and if he assigns a reason or advances a theory in his deficiency notice, though it be erroneous, he is not restricted thereto in his defense of an appeal to the Board asserting such disallowances as error." * * *

We might lend a more sympathetic ear to a taxpayer who was not given adequate advance information of the respondent's position by either the notice of deficiency, the pleadings, or the opening statement so as to enable him to recognize and prepare for the factual issues. Petitioner has not seriously contended that he did not have adequate advance notice of respondent's position with respect to the depreciation issues. Indeed, it seems obvious from the trial record that petitioner was well aware of the general issues in controversy, and no element of surprise to the detriment of his presentation could be detected. We therefore proceed to the substantive issues of this case with the burden of proof resting in the normal manner upon petitioner.

Respondent determined that petitioner's claimed deduction for depreciation of the 8th and Walnut Building was excessive and not allowable under section 167 during the years in question. A depreciation deduction is allowed for property used in a trade or business or held for the production of income. Section 167(g) of the Code provides that the basis for the depreciation deduction is the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property. Generally, the adjusted basis for determining gain or loss from the sale of property is the amount paid for such property in cash or other property. Sec. 1.1012–1, Income Tax Regs. Thus, in a situation of outright purchase, the amount paid for the property constitutes the depreciable basis. Moreover, it is well accepted that a purchase-money debt obligation for part of the price will be included in basis. This is necessary in order to equate a purchase-money mortgage situation with the situation in which the buyer borrows the full amount of the purchase price from a third party and pays the seller in cash. It is clear that the depreciable basis should be the same in both instances.

Respondent's position is essentially that the purchase-money mortgage involved in this case was a nullity and that a capital investment in the subject property had not occurred. The $10,000 cash downpayment was treated in Exhibit A to the deficiency notice as the cost of obtaining a 99-year lease, thus qualifying for amortization deductions over the term of the lease. This treatment gives rise to the inference

that respondent determined that the transaction actually resulted in the creation of a long-term lease. On brief, respondent adds the additional contention that in effect all petitioner acquired was an option to purchase at any time during the alleged lease.

Respondent's position apparently results from his objections to certain features of the purchase-money mortgage. Petitioner was not personally liable on the mortgage, and the only recourse available to the mortgagee in case of default was foreclosure against the property; the property was the only security under the mortgage agreement. Respondent argues that when there is no enforceable and binding personal obligation with respect to the purchase price, no debt is created.

The absence of a debt is also indicated by the indefinite amount of the alleged obligation, according to respondent. This is evidently a reference to the fact that petitioner could pay off the mortgage in the first or 2 succeeding years with an amount stipulated in the purchase-money mortgage which was less than the face amount due after the expiration of 3 years. Thus, the amount due on the mortgage could fluctuate between three different sums depending upon whether payment occurred within the first year, the second, or third year, or years thereafter.

Respondent also emphasizes the fact that after two initial payments of $5,000 each, no portion of the principal of the purchase-money mortgage was due on or before 99 years from the date of the obligation. Petitioner did have the option, however, to make payments of principal at any time during the term of the mortgage. Petitioner was obligated to pay a fixed sum of $18,000 per year, designated as interest, in monthly installments. If the principal due on the mortgage was reduced below $300,000, then interest was payable at the rate of 6 percent per year on the unpaid balance.

It is undisputed that petitioner became the owner of legal title to the 8th and Walnut Building. There is no hint of a sham transaction in the transfer of title to the building and respondent makes no contention that the transaction was a sham or rigged to appear to be a sale and mortgage back when it was in fact something else. We are concerned with an arm's-length transaction entered into between knowledgeable strangers for business motives. It is well accepted, however, that depreciation is not predicated upon ownership of property but rather upon an investment in property. *Gladding Dry Goods Co.*, 2 B.T.A. 336 (1925). It therefore follows that the benefit of the depreciation deduction should inure to those who would suffer an economic loss caused by wear and exhaustion of the business property. See *Thomas W. Blake, Jr.*, 20 T.C. 721 (1953).

Respondent relies upon the preceding cases and general statements in *Weiss* v. *Wiener*, 279 U.S. 333 (1929), to the effect that only a capital investment is depreciable, to support his view that the petitioner did not have a depreciable interest in the 8th and Walnut Building.

We must first decide whether the absence of personal liability with respect to the purchase-money mortgage precludes the inclusion of any amount attributable to the mortgage in the depreciable basis of the property. If this is true, depreciation based on the purchase-money mortgage should be denied regardless of the existence of a bona fide debt obligation for the mortgage. An analysis of this question must begin with the Supreme Court's landmark decision in *Crane* v. *Commissioner*, 331 U.S. 1 (1947). The *Crane* case involved the question of what the proper basis of inherited property was for the purpose of computing the taxable gain on the sale of the property. The property was received subject to an unassumed mortgage and was sold still so encumbered. The Court held that the basis of the property was the value at the date of death undiminished by the mortgage. The inclusion of the indebtedness in basis was balanced by a similar inclusion of the indebtedness in amount realized upon the ultimate sale of the property to a nonassuming grantee.

The relevance of the *Crane* case to the issue of depreciable basis arises due to section 167(g) which states that the basis for depreciation shall be the same as the basis for gain or loss on a sale or exchange under section 1011. Thus, the *Crane* case constitutes strong authority for the proposition that the basis used for depreciation as well as the computation of gain or loss would include the amount of an unassumed mortgage on the property.

This position was expressly adopted by this Court in *Blackstone Theatre Co.*, 12 T.C. 801, 804 (1949), acq. 1949–2 C.B. 1, with the following language:

From *Crane* we can deduce the following applicable principles: (a) the basis for given property includes liens thereon, even though not personally assumed by the taxpayer; and (b) the depreciation allowance should be computed on the full amount of this basis. * * *

The respondent argues that the *Crane* case should not apply in a purchase situation since the basis in that case started with fair market value and not cost, as in the case of a purchase. The reasoning of the *Crane* case, however, seems equally applicable to a purchase situation and indeed was so applied in the *Blackstone Theatre Co.* case and *Parker* v. *Delaney*, 186 F. 2d 455 (C.A. 1, 1950). It should also be applied here.

The element of the lack of personal liability has little real significance due to common business practices. As we have indicated in our findings it is not at all unusual in current mortgage financing of income-producing properties to limit liability to the property involved.

Taxpayers who are not personally liable for encumbrances on property should be allowed depreciation deductions affording competitive equality with taxpayers who are personally liable for encumbrances or taxpayers who own unencumbered property. The effect of such a policy is to give the taxpayer an advance credit for the amount of the mortgage. This appears to be reasonable since it can be assumed that a capital investment in the amount of the mortgage will eventually occur despite the absence of personal liability. The respondent has not suggested any rationale that would reasonably require a contrary conclusion. The lien created by the purchase-money mortgage, like the tax liens in the *Blackstone Theatre* case, should be included in basis for the purpose of computing depreciation.

Having determined that the absence of personal liability with respect to a purchase-money mortgage does not preclude the inclusion of the mortgage in the depreciable basis of the property, we must decide whether the purchase-money mortgage involved in this case should be considered a bona fide debt obligation. Respondent argues that even if the usual purchase-money mortgage should be included in depreciable basis, this doctrine would be inapplicable in a situation where the alleged debt instrument does not create any obligation to pay the purchase price.

The bases for respondent's contention that no debt obligation was created are the absence of personal liability on the mortgage and the fact that the principal of the mortgage was not due for 99 years. We have already discussed the relative unimportance of personal liability in modern business transactions. We hold that this does not affect the validity of the mortgage debt. Therefore, if we are to conclude that there was no debt it must be because of the 99-year term for maturity. Although this term does seem unusually long, after viewing the totality of the circumstances and all the evidence of record we have found and hold that a valid debt obligation was created by the purchase-money mortgage in question.

Contrary to respondent's asserted position, we do not believe that this transaction was in reality or substance a lease with an option to purchase. The uncontroverted testimony of petitioner and a representative of the Balch Estate was that a sale was intended with an understanding that there would be a conversion to institutional mortgage financing as soon as possible. These witnesses were forthright, impressive, and entirely believable. It is clear that the 99-year term was never expected to run its course, but even absent this factor, it should be realized that a definite contractual obligation was created which would have had to be fulfilled by or before a definite date in the future. The sales transaction was normal in every other way, and the actions of the parties to the transaction certainly support our con-

clusions that a bona fide sale occurred and a valid debt obligation for most of the purchase price was created. Petitioner invested in improvements for the building and undertook the usual duties of a property owner. He worked diligently to find the highest and best use for the property so that he could obtain conventional financing. Within a few years he succeeded and retired the mortgage as the parties understood and hoped.

As we view the evidence before us, we do not have a substance versus form situation here because substance and form coincide. Although it can be argued that the economic realities of the transaction would be the same whether the transaction was characterized as a sale with a purchase-money mortgage or a long-term lease with an option to purchase at any time, the evidence is convincing that the parties to the transaction intended a sale and mortgage and the form was consistent with this intent. We therefore hold that the transaction was in substance as well as form an effective sale and purchase-money mortgage for income tax purposes.

Respondent's final argument for denial of the depreciation deductions on the 8th and Walnut Building is based on the proposition that even though the purchase-money mortgage imposed an obligation on petitioner, the obligation cannot be considered as part of the depreciable basis since the cost of property for the purpose of determining basis for depreciation does not include any amount with respect to obligations which are contingent and indefinite in nature. *Columbus & Greenville Railway Co.*, 42 T.C. 834 (1964); *Albany Car Wheel Co.*, 40 T.C. 831 (1963), affirmed per curiam 333 F. 2d 653 (C.A. 2, 1964); *Lloyd H. Redford*, 28 T.C. 773 (1957). An example of the type of contingency referred to in the preceding proposition was present in the *Albany Car Wheel Co.* case. In that case we found that the purchaser-taxpayer's obligation under the purchase agreement to procure a release of the predecessor's liability under a union contract for severance pay was of such a contingent nature that it could not be considered a part of the cost of the assets acquired. Whether it would ever be necessary to satisfy any severance pay obligations was unknown at the time of the sale.

Similarly, in the *Lloyd H. Redford* case the amount of a note was held not to be includable in basis since the note was only payable from profits and it was uncertain whether there would ever be profits.

It was held in the *Columbus & Greenville Railway Co.* case that basis did not include any amount of a mortgage where there was no primary responsibility and no fixed indebtedness for which the taxpayer or its property was liable.

We hold that the doctrine supported by the foregoing cases is inapplicable to the subject purchase-money mortgage. Respondent con-

354

tends that the amount of the obligation was indefinite because of the varying amounts due under the terms of the instrument and the fact that the purchase-money mortgage was eventually settled for the negotiated price of $200,000, a substantial reduction from the amount due under the instrument.

There were only two variables in the overall purchase price of the property, and they were specified in dollar amounts. The price depended then upon whether the purchase-money mortgage was paid within the first year, the second year, or years thereafter. We would classify such a price reduction for early payment as a bonus discount. The presence of such optional discounts does not make the purchase price indefinite. It merely provided an incentive for very early retirement of the mortgage which did not occur. The cost basis at the time of purchase should be the nondiscount price; the entire principal of the note and mortgage was due unless the discounted sums were paid in the first 2 years. It was not prepaid so as to provide for the application of the discount provisions and hence no adjustment in basis is required during the years before us. It is evident from the record that if the lien on the property provided by the mortgage were to be discharged at any time prior to its due date, the then fixed amount would necessarily have to be paid. There was nothing contingent or indefinite about the obligation here.

The subsequent settlement of the purchase-money mortgage for less than the amount due under the terms of the instrument should not affect the allowable depreciation in taxable years prior to the settlement. In the *Blackstone Theatre Co.* case, the taxpayer acquired real estate with outstanding tax liens exceeding $120,000. Although there was no personal liability as to these liens and although the liens were settled 5 years after the acquisition for $50,000, the depreciable basis for the intervening years was held to include the full $120,000. Here we are concerned with an arm's-length business transaction and there is no logical basis for disregarding the purchase price provided for in the purchase-money mortgage.

Since we have decided the depreciation issue involving the 8th and Walnut Building in petitioner's favor, it is unnecessary to decide whether the $10,000 downpayment should have been amortized as the cost of obtaining a lease over 25 years, the estimated life of the building, rather than 99 years, the period of the alleged lease.

The final issue in this case involves an adjustment to claimed depreciation on petitioner's Forest Avenue property. Respondent contended at trial that this adjustment was made to eliminate from depreciable basis the cost of a boiler, which cost had been deducted by petitioner as expenses in years prior to the years in question. No evidence was introduced at the trial about this issue, and petitioner's

brief is almost entirely silent about it. Petitioner has apparently conceded that if the notice of deficiency imposed the burden of proof upon him, then this issue should be decided against him. Since we have held that the notice of deficiency did constitute a determination, thereby placing the burden of proof on petitioner, we sustain respondent's action with respect to this issue.

*Decision will be entered under Rule 50.*