Lowell D. Ferris v. Commissioner.
Ferris v. Commissioner
Docket Nos. 5585-66, 2694-67.
United States Tax Court
T.C. Memo 1968-192; 1968 Tax Ct. Memo LEXIS 110; 27 T.C.M. (CCH) 937; T.C.M. (RIA) 68192; August 29, 1968. Filed Lowell D. Ferris, pro se, 712 Reid St., West DePere, Wis. Alan B. Shidler, for the respondent. WITHEY
Memorandum Findings *111 of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in petitioner's income tax for the years and in the amounts as follows: Docket No.
Year
Deficiency
5585-66
1963
$597.84
1964
374.22
2694-67
1965
261.00
These cases have been consolidated and will be decided together. The sole issue is whether petitioner had a cost basis in a patent during any of the years in question so as to be entitled to an allowance for depreciation under section 167 of the Internal Revenue Code of 1954. [1]
Findings of Fact All of the facts have been stipulated and are so found. At the time the petitioners for these consolidated cases were filed, petitioner's address was 712 Reid Street, West DePere, Wisconsin. During the years 1963 through 1965, petitioner filed individual Federal income tax returns for the calendar year on the cash basis method of accounting with the district director of internal revenue, Milwaukee, Wisconsin. Petitioner was on active duty with the United States Army during 1963 and a portion of 1964. In 1965, he was a divinity *112 student and assistant church pastor. He was ordained to the ministry in 1966 and is currently an assistant minister in a Wakefield, Massachusetts, church. For the taxable years in question, his gross income from all sources was as follows: 1963 - $4,865.31; 1964 - $3,596.12; and 1965 - $1,848. On December 21, 1963, petitioner entered into a document captioned "Contract" (hereinafter referred to as the contract) with the Ferris Engineering Company (hereinafter referred to as the Company), a sole proprietorship conducted by petitioner's father, James A. Ferris, Sr. The substantive provisions of the contract, wherein the Company was designated "Seller" and petitioner "Buyer," provided as follows: 938 ONE - DU-CUT [2] double-cutting Cut-off Machine, experimental model No. DU-101, DESIGNED ACCORDING TO THE CLAIMS OF U.S. Patent No. , suitable for demonstration and for further experimentation, together with all stores of experimental mechanisms and components, whether operable or inoperable, all stores of prospects' work pieces, raw and finished; all engineering drawings, charts, calculations, records of experiments, correspondence of any nature, patent drawings, patent application *113 papers, and records of interest shown. For the aforementioned goods, and for Seller's services to this contract date in research, engineering, experimentation and patent prosecution; and to re-imburse Seller for all monies advanced for building, experimenting, and for the prosecution and procuring of the patent, Buyer agrees to pay Seller the amount of THIRTY THOUSAND dollars, the terms of payment being inclusive of ONE THOUSAND dollars upon sale of each such machine until the face amount of this contract shall have been fully paid. On January 9, 1958, petitioner filed an application for letters patent on an invention which relates to a commercial cutting machine and by May, 1959, the Company had completed a prototype of that machine. On January 21, 1964, petitioner was issued United States Patent No. 3,118,337. Petitioner's father has not reported any income in connection with the contract on any of his Federal or State income tax returns for the years 1963 through 1965. Although the Company incurred the expenditure involved in the research and development of petitioner's patent, the Company *114 has not reported any income from nor claimed any deduction in connection with the contract on any of its Federal or State income tax returns for the years 1963 through 1965. Neither has petitioner claimed any deduction on any part or all of the cost of the machine or patent as current business expenses on any of his Federal or State income tax returns for any tax year. Petitioner has not been allowed any part of the cost of the machine or patent as either depreciation or as business cost or loss in any tax year. In 1965, the Company paid petitioner $2,000 as royalties, based upon an oral agreement that the Company had a franchise in the patent. James A. Ferris, Sr., wrote petitioner a letter dated May 3, 1967, [3] which purportedly intended to clarify the pre-existing liability of petitioner under the contract entered into between petitioner and the Company on December 21, 1963. The portions of the letter bearing on petitioner's liability to the company are as follows: *115 The fixed liability in the contract is, indeed, $30,000; the very common, even usual, royalty clause - to assure a partial payment of the face, every time a machine is sold, thus (usually) hastening the completion of payment - is, simply, and as plainly expressed, merely an included stipulation, not acting at all to "unfix" the face liability. To limit payments to royalty payments, the wording would necessarily have to express such payments as being "ex clusive" - that is, no other types of payments to be made. Many contracts involving patents are so made, do not even require the word "exclusive" when no face amount is called out, no limit on royalties. Furthermore, the "until the face amount shall have been fully paid" again expresses and contemplates fixed liability to the face amount. The genius of our contract is that it assures FERRIS ENGINEERING full payment of the face amount, while protecting you from paying more - the limit being set at the face amount; and as compared to the "exclusively" royalty payments where no limits are set. In the latter type of contract - our market analysis of potential being hundreds, perhaps thousands, of machines you might well buy several *116 times $30,000 in the long run. No machines covered by the patent were sold during the years in question or at any other time prior to the hearing of this case, nor has petitioner made any payments to the Company under the contract. Opinion The sole issue presented for our determination is whether petitioner, during the years in question, had a cost basis in his patent which would entitle him to an allowance for depreciation.[4]Section 167(a) of 939 the Code provides that where a taxpayer's property is either used in his trade or business or held for the production of income, he shall be allowed a depreciation deduction on the property. Section 167(g) provides that in determining the basis for the allowable depreciation, reference shall be had to section 1011 which, in turn, provides that the taxpayer's basis shall be determined under section 1012. The latter section provides, in pertinent part, that "The basis of property shall be the cost of such property," and it is now settled that the "cost" of which the statute speaks is the taxpayer's cost. As we stated in Detroit Edison Co., 45 B.T.A. 358, 361 (1941), *117 affd. 131 F. 2d 619 (C.A. 6, 1942), affd. 319 U.S. 98 (1943), "The mere ownership of property which cost the owner nothing does not give rise to the right of a depreciation allowance." However, it is equally well established that a taxpayer may acquire a cost basis in property, for purposes of depreciation, not only by payment of the contract price, but also by purchasing property impressed with a lien, Crane v. Commissioner, 331 U.S. 1 (1947); Blackstone Theatre Co., 12 T.C. 801 (1949), as well as incurring a valid debt obligation for the purchase price. Manuel D. Mayerson, 47 T.C. 340 (1966). Petitioner appears to contend that the contract he entered into with his father's sole proprietorship business in December 1963, constituted a valid and binding obligation, which at that time established his liability in the contract amount of $30,000, thereby entitling *118 him to depreciate that amount over the life of the patent. Respondent, on the other hand, contends that the understanding of the parties to that contract was merely that "if and when" the patented machines were sold, petitioner was to repay his father at the rate of $1,000 per machine, with no financial obligation in the event machines were never sold. The contract purports to establish a liability on petitioner's part to pay the Company $30,000 for the labor and materials expended by the Company in the construction of petitioner's cutting machine, including research, engineering, experimentation, and prosecution of the patent. While the contract is quite short, it is clear with respect to the consideration the Company provided to petitioner. The more difficult problem is to determine, from the language of the contract, what consideration petitioner promised to pay the Company for its services and material. The only relevant provision of that contract reads as follows: * * * Buyer [petitioner] agrees to pay Seller [Ferris] the amount of THIRTY THOUSAND dollars, the terms of payment being inclusive of ONE THOUSAND dollars upon sale of each such machine until the face amount *119 of this contract shall have been fully paid. In light of our consideration of all the facts presented, we are convinced that the parties did not intend by the contract to create a binding obligation on petitioner for $30,000 in the event cutting machines were never sold. The parties to the contract were father and son and because of that fact, we must scrutinize the transaction carefully. Jeannette W. Fitz Gibbon 19 T.C. 78 (1952). Petitioner filed his application for letters patent on January 9, 1958, and a prototype machine built by the Company, was actually in existence at least as early as May 1959. While it is therefore obvious that the Company had expended time and material on petitioner's machine and patent even prior to mid-1959, the record fails to disclose any promise on petitioner's part to compensate his father until the signing of the contract on December 21, 1963. The contract date takes on added meaning since it appears that in early December 1963 petitioner had received written notice from the Patent Office indicating that letters patent would be issued to him within the near future. Thus, it was not until the parties were certain that the patent had *120 been approved that they entered into the contract. This circumstance, together with the fact that petitioner had not promised to compensate the Company in the more than 4 1/2 years since completion of both the patent application and prototype machine, strongly suggests that petitioner's father would not have asked for and petitioner would not have offered to make any payments had the patent application been denied. [5] However, once the patent had been approved, the parties anticipated that future revenue would be generated from machine sales and there was then no reason why petitioner should not pay for the services and material supplied by his father's 940 business. The language employed in the contract clearly reflected this thinking by providing that the purported contract price of $30,000 was to be paid off at the rate of $1,000 for every machine sold. We are convinced that neither father nor son intended any payments to be made absent the sale of petitioner's machines, and consistent with this view, we note that from the date of the contract, December 21, 1963, to the time this case was submitted for decision, October 30, 1967, no cutting machines were sold and petitioner *121 made no payments to his father's business under the contract. In light of the foregoing facts and observations, we must agree with respondent that payment under the contract was subject to a condition subsequent which has never occurred, and therefore, until such time as petitioner makes some payment on the contract price, his cost in the patent, for purposes of depreciation, will remain zero. Thus, petitioner has never incurred a valid debt obligation to his father, with the result that for the years in question he had no cost basis in the patent to depreciate. In arriving at this conclusion, we have considered the letter sent to petitioner by his father on May 3, 1967, purportedly attempting to point out the intention of the parties to the December 1963 contract. Inasmuch as that letter was obviously prepared in anticipation of litigation, and in light of the other facts supporting our conclusion, we see no reason to alter *122 our decision on that basis. Decisions will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. Petitioner's business is internationally known as DU-CUT Manufacturing Company.↩
3. This letter was dated approximately 3 1/2 years after petitioner had entered the contract with the Company, subsequent to the filing of the petition covering the years 1963 and 1964, and only one month before the filing of the petition covering the last year in question, 1965.↩
4. As to other adjustments in the notice of deficiency relative to the years 1963 and 1964 which were not questioned by petitioner in his petition, and upon which no facts have been introduced into the record, we deem them to be conceded by petitioner.↩
5. Considering the extremely small income reported by petitioner during the years in question, it would have been virtually impossible for him to realistically believe that he would be able to make any meaningful payments toward the $30,000 contract price.↩