T.C. Memo. 2018-178

UNITED STATES TAX COURT

ESTATE OF FRANK D. STREIGHTOFF, DECEASED, ELIZABETH DOAN
STREIGHTOFF, EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4379-15.                          Filed October 24, 2018.

Michael C. Riddle and Harold A. Chamberlain, for petitioner.

Susan M. Fenner and Christina D. White, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, Judge:  Respondent determined a deficiency of $491,750 in

the Federal estate tax of the Estate of Frank D. Streightoff (estate).  The issue for

consideration is the type and value of an interest that Frank D. Streightoff

(decedent) transferred during his lifetime to a revocable trust.  Unless otherwise

[*2] indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Decedent died May 6, 2011. He resided in Texas at the time of his death. Decedent's daughter, Elizabeth Doan Streightoff (Ms. Streightoff), was appointed executor of the estate. She resided in Texas when the petition was filed. During decedent's lifetime Ms. Streightoff also held decedent's power of attorney (POA). The estate was probated in Texas.

I.    Streightoff Investments, LP

On October 1, 2008, decedent, through Ms. Streightoff, formed Streightoff Investments, LP (Streightoff Investments), as a limited partnership under the provisions of the Texas Revised Limited Partnership Act (TRLPA), Tex. Rev. Civ. Stat. Ann. art. 6132a-1 (West 2008). Streightoff Investments did not hold partnership meetings or have votes.

The partnership agreement stated that the purpose of Streightoff Investments was to make a profit, increase wealth, and provide a means for decedent's family to manage and preserve family assets. Decedent funded

[*3] Streightoff Investments with assets including marketable equity securities, municipal bonds, mutual fund investments, other investments, and cash. As of January 31, 2009, 61.6% of Streightoff Investments' assets consisted of marketable equity securities, 23.6% consisted of fixed-income investments in municipal bonds, and 13.3% was invested in mutual funds. Its portfolio of publicly traded marketable equity securities was managed by professional money managers. The remaining 1.5% was invested in cash and other investments.

Streightoff Management, LLC (Streightoff Management), was Streightoff Investments' sole general partner. Ms. Streightoff was manager of Streightoff Management. The partnership agreement for Streightoff Investments provided that the general partner "shall perform or cause to be performed * * * the trade or business of the Partnership", subject only to limitations set forth expressly in the partnership agreement.

Decedent, his daughters, his sons, and his former daughter-in-law were Streightoff Investments' original limited partners under the partnership agreement. The limited partners other than decedent received their limited partnership interests as gifts. Decedent reported these gifts on a Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, filed for 2009.

[*4]   The partnership agreement specified that decedent and the other partners received the following interests upon formation:

| Partner | General or limited | Percentage interest |
|---|---|---|
| Streightoff Management | General | 1.00% |
| Decedent | Limited | 88.99 |
| Elizabeth Streightoff | Limited | 1.54 |
| Ann Fennell Brace | Limited | 1.54 |
| Camille Schuman | Limited | 1.54 |
| Jennifer Ketchum Hodges | Limited | 1.54 |
| Hilary Dane Billingslea | Limited | 1.54 |
| Charles Franklin Streightoff | Limited | 0.77 |
| Frank Hatch Streightoff | Limited | 0.77 |
| Priscilla Streightoff | Limited | 0.77 |

Section 1.5 of the partnership agreement provided that Streightoff Investments would terminate December 31, 2075, unless terminated sooner upon the happening of certain events.  Section 1.5(b) provided that the partnership terminated upon the removal of the general partner.  Under article V limited partners could remove the general partner by written agreement of limited partners owning 75% or more of the partnership interests held by all limited partners. Section 1.5 provided that if the partnership terminated by reason of the general

[*5] partner's removal, then 75% of the limited partners could reconstitute the partnership and elect a successor general partner. Limited partners owning at least 75% of the ownership percentage in the partnership could approve the admission of additional limited partners to the partnership.

Section 7.2 of the partnership agreement provided that a limited partner could not sell or assign an interest in Streightoff Investments without obtaining the written approval of the general partner, which the agreement provided would not be unreasonably withheld. Pursuant to section 7.2 any partner who assigned his or her interest remained liable to the partnership for promised contributions or excessive distributions unless and until the assignee was admitted as a substituted limited partner. Once the assignee was admitted as a substituted limited partner, the assignor no longer was liable to the partnership. The general partner could elect to treat an assignee as a substituted limited partner in the place of the assignor. An assignor was deemed to continue to hold the assigned interest for the purposes of any vote taken by limited partners under the partnership agreement until the assignee was admitted as a substituted limited partner.

All transfers of interests in Streightoff Investments were subject to limitations. Section 9.2 provided that partners in the partnership were allowed to make only permitted transfers of their interests. Permitted transfers were transfers

**[*6]** (1) to any member of the transferor's family, (2) to the transferor's executor, trustee, or personal representative to whom his or her interest passes at death or by operation of law, or (3) to any purchaser, but subject to the right of first refusal held by the persons listed in section 9.4.

Section 9.4 provided that any partner who received an outside purchase offer for his or her interest was required, before accepting the offer, to provide each of the "priority family",[1] the partnership, and the general partner an opportunity to acquire the interest according to terms the same as or better than those offered by the outside purchaser. Whether the partnership exercised its right of first refusal to purchase a partner's interest was subject to the approval of the general partner and limited partners owning at least 50% of the partnership interests held by all limited partners (with the exception of the seller if he or she was a limited partner).

The partnership agreement referred to persons who acquired interests in Streightoff Investments but who were not admitted as substituted limited partners to the partnership as "unadmitted assignees". Section 9.6 provided that "unadmitted assignees" were entitled only to allocations and distributions in

---

[1]The partnership agreement defines priority family as the transferor's "spouse, natural or adoptive lineal ancestors or descendants, and trusts for his or their exclusive benefit."

**[\*7]** respect of their acquired interests. "Unadmitted assignees" had no right to any information or accounting of the affairs of the partnership, were not entitled to inspect the books or records of the partnership, and did not have any of the rights of a general or limited partner under TRLPA.

The partnership agreement provided that a transferee of an interest in Streightoff Investments could become a substituted limited partner upon satisfaction of certain conditions set out in section 9.7. These conditions included: (1) that each general partner consent; (2) that the interest with respect to which the transferee is being admitted be acquired by means of a permitted transfer; and (3) that the transferee become a party to the partnership agreement as a limited partner and execute such documents and instruments as the general partner may request to confirm that the transferee agreed to be bound by the terms and conditions of the partnership agreement. The partnership agreement provided that an interest holder who was admitted to the partnership as a substituted limited partner would be treated the same as an original limited partner under the terms of the partnership agreement.

II.     Frank D. Streightoff Revocable Living Trust

On October 1, 2008, the same day that decedent formed Streightoff Investments, he established the Frank D. Streightoff Revocable Living Trust

**[\*8]** (revocable trust).  Also on October 1, 2008, he transferred his 88.99% interest in Streightoff Investments to the revocable trust.  Decedent was grantor of the revocable trust, and he held the power during his life to amend, alter, revoke, or terminate it.  He was the revocable trust's sole beneficiary, and Ms. Streightoff was the trustee.  Decedent was entitled to receive distributions of trust income and could receive distributions of the trust principal upon his request.

On October 1, 2008, decedent, through Ms. Streightoff, executed an agreement entitled "Assignment of Interest" (agreement), which designated decedent as "assignor" and the revocable trust as "assignee".  The agreement provided that decedent made an "assignment" of all of his limited partnership interest in Streightoff Investments.  It provided that decedent transferred "[his] interest in the above described premises, together with all and singular the rights and appurtenances thereto in anywise belonging, unto the said Assignee, its beneficiaries and assigns forever" and that he bound himself and "[his] heirs, executors, and administrators to * * * provide any further documentation or execute any additional legal instruments necessary to provide the assignee all the rights the Assignor may have had in the property."  The agreement provided that the revocable trust "by signing this Assignment of Interest, hereby agrees to abide

[*9] by all the terms and provisions in that certain Limited Partnership Agreement of STREIGHTOFF INVESTMENTS, LP, dated effective October 1, 2008."

Decedent's transfer of his interest was a permitted transfer under section 9.2 of the partnership agreement. Ms. Streightoff signed the transfer agreement in her capacities as holder of decedent's POA, trustee of the revocable trust, and managing member of Streightoff Management.

III.    Estate Tax Return and Notice of Deficiency

On August 9, 2012, the estate filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (estate tax return). Ms. Streightoff as decedent's executor elected to use the alternate valuation date of November 6, 2011, to value the estate's assets. On the estate tax return the estate reported a gross estate less the exclusion of $5,051,299.

On November 6, 2011, the partnership's net asset value (NAV) was $8,212,103. It held the following assets with the following market values:

[*10]

| Assets | Market value |
|---|---|
| Cash | $198,453 |
| Marketable equity securities | 5,590,778 |
| Marketable municipal bonds | 2,386,277 |
| Marketable corporate bonds | 30,366 |
| Sovereign debt | 6,229 |
| Total | 8,212,103 |

The estate reported on the estate tax return that decedent had made transfers described in section 2035, 2036, 2037, or 2038 during his lifetime. It filed with the estate tax return a Schedule G, Transfers During Decedent's Life, identifying those transfers. A supplemental statement attached to the estate tax return provided the following explanation with respect to decedent's lifetime transfers:

> THE DECEDENT ESTABLISHED * * * [the revocable trust], FOR WHICH THE TERMS WERE REVOCABLE AND AMENDABLE BY THE DECEDENT DURING HIS LIFETIME. THE VALUE OF THE ASSETS TRANSFERRED TO THE TRUSTEE DURING THE LIFETIME OF THE DECEDENT HAVE BEEN REPORTED, PURSUANT TO SECTION 2038 OF THE INTERNAL REVENUE CODE, ON SCHEDULE G * * *.

On Schedule G the estate described the property transferred to the revocable trust as an assignee interest in an 88.99% limited partnership interest. The estate reported the value of the transferred interest as $4,588,000 as of the alternate

[*11] valuation date. The estate's valuation of the transferred interest calculated 88.99% of the partnership's NAV on the alternate valuation date (i.e., $7,307,951) and discounted that value by 37.2%. In a supplemental statement the estate indicated that it claimed discounts for lack of marketability, lack of control, and lack of liquidity.

On January 9, 2015, respondent sent the notice of deficiency on which this case is based (notice), determining a deficiency of $491,750. The notice contained a letter addressed to the estate's representative and its counsel, Michael C. Riddle, with several enclosures. The enclosures included a Form 1273, Report of Estate Tax Examination Changes, a Form 6180, Line Adjustment--Estate Tax, and two Forms 886-A, Explanation of Items. The Form 6180 showed an adjustment in value to items reported on Schedule G of $1,405,000. The attached Forms 886-A stated respondent's determination that the corrected value of decedent's interest in Streightoff Investments on the alternate valuation date was $5,993,000.

IV.   Procedural Backround

On June 19, 2015, the estate filed a motion for summary judgment contending that in issuing the notice respondent had violated provisions of the Administrative Procedure Act (APA). On September 13, 2016, a hearing was held

[*12] on the motion.  The estate argued that the notice was invalid and should be set aside and that the Court lacked jurisdiction.

On September 15, 2016, the Court rendered an Oral Findings of Fact and Opinion on the estate's motion.  We rejected the estate's contentions regarding the validity of the notice and held that the Court had jurisdiction to redetermine the deficiency at issue.  We concluded that "the application of APA to proceedings for the redetermination of a deficiency, such as this one, have been soundly rejected in Ax v. Commissioner, 146 T.C. __ (April 11, 2016)."  On October 11, 2016, the Court issued an order denying the motion for summary judgment.

OPINION

I.     Validity of the Notice

The estate contends that the notice states a naked deficiency amount because it describes no basis for the determination of any additional tax due.  It argues that respondent valued a property interest that decedent did not own on his date of death.  Respondent contends that the notice is valid and does not violate section 7522(a).

Section 7522(a) provides that any deficiency notice "shall describe the basis for * * * the tax due * * * in such notice."  An inadequate description of the basis for the deficiency does not invalidate the notice.  Id.  Generally, we have required

**[\*13]** that a notice provide a formal notification that a deficiency in tax has been determined. Pietz v. Commissioner, 59 T.C. 207, 213-214 (1972). We look at the notice with all the attachments as a whole. See Saint Paul Bottling Co. v. Commissioner, 34 T.C. 1137, 1138 (1960).

The notice states the year and the amount of estate tax due. Attached to the notice were Forms 886-A, which showed respondent's determination of the value of decedent's interest in Streightoff Investments. We conclude on the evidence that respondent complied with section 7522(a). Even if we concluded that respondent had not provided the basis for the determination, the case would not be dismissed, because an inadequate description does not invalidate a notice of deficiency. See sec. 7522(a)

## II.  Burden of Proof

Generally, the taxpayer bears the burden of proving that the Commissioner's determinations in the notice of deficiency are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The burden of proof may shift to the Commissioner if the taxpayer establishes that it complied with the requirements of section 7491(a)(2)(A) and (B) to substantiate items, to maintain required records, and to cooperate fully with the Commissioner's reasonable requests. The estate contends that the burden of proof should be shifted to respondent.

[*14] We conclude that the parties have stipulated all operative facts and documents needed to decide the issues presented, and which party bears the burden of proof is irrelevant. Estate of Morgens v. Commissioner, 133 T.C. 402, 409 (2009), aff'd, 678 F.3d 769 (9th Cir. 2012). The nature of the property interest transferred to the revocable trust is a legal issue that can be decided on the basis of the agreed facts.

The question of fair market value is an question of fact. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). The parties' experts offer different conclusions regarding the value of the transferred interest based on differing interpretations of the relevant facts. However, we are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). We resolve the valuation issue on the preponderance of the evidence in the record with the guidance of those expert opinions that we find most helpful.

III.    Type of Interest

The parties disagree as to the type of interest that must be valued and included in the value of decedent's gross estate.[2] The estate contends that the

---

[2]The parties agree that the value of decedent's interest in Streightoff Investments transferred to the revocable trust is includible in the value of the gross
(continued...)

[*15] agreement created an assignee interest in decedent's limited partnership interest under Texas State law and the partnership agreement. It contends that it valued and reported decedent's interest in the revocable trust correctly as an assignee interest on Schedule G of its tax return.

Respondent contends that the agreement did not create an assignee interest held by the revocable trust. Respondent argues that decedent transferred his 88.99% limited partnership interest to the revocable trust and the value to be included in the value of the gross estate should be that of a limited partnership interest.

We need to determine whether the interest decedent transferred to the revocable trust was a limited partnership interest or an assignee interest. Generally, State law determines the property interest that has been transferred for Federal estate tax purposes. See McCord v. Commissioner, 120 T.C. 358, 370 (2003), rev'd and remanded on other grounds, 461 F.3d 614 (5th Cir. 2006). TRLPA (as in effect for the relevant period) provides that a partnership interest is personal property and is assignable, in whole or in part, unless the partnership agreement provides otherwise. Tex. Rev. Civ. Stat. Ann. art. 6132a-1, secs. 7.01

---

2(...continued)
estate pursuant to sec. 2038.

**[*16]** and 7.02(a)(1) (West). An assignee of a partnership interest is entitled to receive, to the extent assigned, allocations of income, gain, loss, deduction, credit, or similar items, and to receive distributions to which the assignor is entitled, but an assignment does not entitle the assignee "to become, or to exercise rights or powers of, a partner". Id. sec. 7.02(a)(2) and (3). The assignee may become a limited partner, with all rights and powers of a limited partner under a partnership agreement, in the manner that the partnership agreement provides or if all partners consent. Id. sec. 7.04(a) and (b).

Although we consult State law to determine what property interests were transferred, our inquiry may not end there. See McCord v. Commissioner, 120 T.C. at 371. The Federal tax effect of a particular transaction is governed by the substance of the transaction rather than its form. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). The doctrine that the substance of a transaction will prevail over its form has been applied in Federal estate and gift tax cases. See Heyen v. United States, 945 F.2d 359, 363 (10th Cir. 1991); Estate of Murphy v. Commissioner, T.C. Memo. 1990-472. In particular, we have indicated a willingness to look beyond the formalities of intrafamily partnership transfers to determine what, in substance, was transferred. See Kerr v. Commissioner, 113 T.C. 449, 464-468 (1999), aff'd, 292 F.3d 490 (5th Cir. 2002). We will consider

**[*17]** both the form and the substance of decedent's transfer to the revocable trust to determine whether the property interest transferred was an assignee interest or a limited partnership interest.

The partnership agreement in this case allowed for transfers of limited partnership interests and for the admission of substituted limited partners. Section 9.6 provided that a transferee who was not admitted as a substituted limited partner would hold the right to allocations and distributions with respect to the transferred interest but would have no right to any information or accounting or to inspect the books or records of the partnership and would not have any of the rights of a general or limited partner (including the right to vote on partnership matters). Under section 9.7 conditions had to be met for the admission of a transferee of a partnership interest as a substituted limited partner. The estate contends that these conditions were never met with respect to the interest that decedent transferred to the revocable trust and that upon the execution of the agreement the revocable trust received only an assignee interest in decedent's 88.99% limited partnership interest.

The agreement provided that decedent made a transfer to the revocable trust of "[a]ll of * * * [his 88.99%] limited partnership interest" in Streightoff Investments. It further stated that decedent transferred with the interest "all and

[*18] singular the rights and appurtenances thereto in anywise belonging". Although the transfer was labeled an "[a]ssignment", the agreement states that the revocable trust is entitled to all rights associated with the ownership of decedent's 88.99% limited partnership interest, not those of an assignee. All "rights and appurtenances" belonging to decedent's interest include the right to vote as a limited partner and exercise certain powers as provided in the partnership agreement.

The agreement provided that decedent was bound to provide any documentation or execute any legal instruments necessary "to provide * * * [the revocable trust] all the rights * * * [decedent] may have had" in the limited partnership interest. Decedent's rights in the limited partnership interest were those of a limited partner in the partnership. The agreement satisfied all the conditions for the transfer of decedent's limited partnership interest and the admission of the revocable trust as a substituted limited partner.

Section 9.7 provided that for a transferee to be admitted as a substituted limited partner in respect of a transferred interest in Streightoff Investments (1) the general partner must consent to the transferee's admission, (2) the transferee must have acquired the interest by means of a permitted transfer, and (3) the transferee must agree and execute the instruments necessary to be bound by the terms of the

[*19] partnership agreement. Ms. Streightoff signed the agreement as manager of Streightoff Investments' general partner and gave consent to its terms, which provided for the transfer of all of decedent's rights in the limited partnership interest to the revocable trust. The parties have stipulated that the transfer was a permitted transfer. Lastly, the agreement provided that the revocable trust agreed to abide by all terms and provisions of the partnership agreement, and Ms. Streightoff executed the agreement on behalf of the revocable trust.

We conclude that the form of the agreement establishes that decedent transferred to the revocable trust a limited partnership interest and not an assignee interest. The economic realities underlying the transfer of decedent's interest also support our conclusion that the transferred interest should be treated as a limited partnership interest for Federal estate tax purposes. This is because we conclude that regardless of whether an assignee or a limited partnership interest had been transferred, there would have been no substantial difference before and after the transfer to the revocable trust. See Kerr v. Commissioner, 113 T.C. at 467-468.

Pursuant to Streightoff Investments' partnership agreement only the general partner had the right to direct the partnership's business; neither limited partners nor assignees had managerial rights. The partnership agreement provided that assignees had no rights to any information regarding the business of the

[*20] partnership or to inspection of the books or records of the partnership. However, this distinction made no difference in this case because Ms. Streightoff was both a partner entitled to information regarding Streightoff Investments and the trustee of the revocable trust.

The partnership agreement provided that an "unadmitted assignee" did not have the right to vote as a limited partner. In Kerr v. Commissioner, 113 T.C. at 467, we determined that the only real difference between the rights of a limited partner and those of an assignee was the right to vote on partnership matters, and we concluded that this difference was not significant. We held that under such circumstances the transferred interest should be valued as a limited partnership interest rather than as an assignee interest. Id. Here, we conclude similarly that whether the revocable trust held the voting rights associated with a limited partnership interest would have been of no practical significance.

There were no votes by limited partners following the execution of the agreement. Additionally, during his life decedent held the power to revoke the transfer to the revocable trust. If he had revoked the transfer, he would have held all the rights of a limited partner in Streightoff Investments, including the right to vote on partnership matters. Also, Streightoff Management as the general partner could have treated the holder of an assignee interest as a substitute limited partner.

**[*21]** Under the facts and circumstances of this case, there was no difference in substance between the transfer of a limited partnership interest in Streightoff Investments and the transfer of an assignee interest in that limited partnership interest. See id.; Astleford v. Commissioner, T.C. Memo. 2008-128, slip op. at 16. Accordingly, as a matter of both form and substance, the interest to be valued for estate tax purposes is an 88.99% limited partnership interest in Streightoff Investments.

IV.   Fair Market Value

Generally, the value of an item of property included in the value of a decedent's gross estate is the fair market value of the item at the time of the decedent's death or, if an election is made, on the alternate valuation date. See sec. 20.2031-1(b), Estate Tax Regs. "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Id. The hypothetical willing buyer and the hypothetical willing seller are presumed to be dedicated to achieving the maximum economic advantage. See Estate of Davis v. Commissioner, 110 T.C. 530, 535 (1998).

[*22] Both parties submitted expert reports regarding the fair market value of the interest that decedent transferred to the revocable trust. Juliana Vicelja was respondent's expert, and Oliver Warnke and Alan Harp, employees of Howard Frazier Barker Elliot, Inc. (HFBE), were experts for the estate.

Both parties' experts characterize the partnership as an asset holding entity. They employed valuation methods that determined the value of the transferred interest in Streightoff Investments as 88.99% of the NAV of the partnership, less certain discounts. The parties have stipulated the NAV of the partnership on the alternate valuation date.

A.    Lack of Control

Ms. Vicelja's report determines that decedent's limited partnership interest holds considerable influence and control over the management of Streightoff Investments because of specific provisions in the partnership agreement. The report notes that under article V limited partners with a 75% interest hold the power to remove general partners, and under section 1.5 a general partner's removal terminates the partnership. It states that a prospective purchaser of decedent's 88.99% limited partnership interest would pay more for the degree of control embodied in the interest, including the ability to unilaterally terminate the partnership if he or she does not agree with the management of the general partner.

**[*23]** Her report concludes that no discount for lack of control should be applied to the interest.

HFBE's report assumes that the interest to be valued is an assignee interest in decedent's limited partnership interest and that a hypothetical buyer would pay less for an interest that does not give the holder access to or control over the underlying assets of the partnership. The report acknowledges that the partnership agreement provided limited partners with the right to vote on decisions affecting partnership management, including the removal of the general partner and termination of the partnership, but determines that the interest at issue would provide none of these control benefits because it was an assignee interest. It concludes that a 13.4% discount for lack of control should be applied in valuing the interest.

Since we have determined that the interest transferred was an 88.99% limited partnership interest, we conclude that the interest did not lack control. Accordingly, there is no discount for lack of control.

B.    Lack of Marketability

Both parties' experts relied on factors identified in Mandelbaum v. Commissioner, T.C. Memo. 1995-255, 1995 WL 350881, aff'd, 91 F.3d 124 (3d Cir. 1996), to determine a discount for lack of marketability. These factors, which

**[*24]** generally make an interest in an entity more or less marketable, include:

(1) an analysis of the entity's financial condition, (2) the entity's capacity to pay

and history of paying distributions, (3) the nature of the entity and its economic

outlook, (4) the management of the entity, (5) the amount of control held by the

interest, (6) restrictions on the transferability of the interest, (7) the required

holding period for the interest, (8) the entity's redemption policy, and (9) the costs

associated with making a public offering. Id. at *11.

Respondent's expert report states that generally no ready market exists for

sales of interests in privately held entities and a discount for lack of marketability

is necessary to entice prospective buyers. In quantifying an appropriate

percentage discount for lack of marketability Ms. Vicelja relies on data from

restricted stock studies. These studies reflect that discounts for lack of

marketability for restricted stocks have decreased in more recent years. This trend

is linked to amendments in Securities and Exchange Commission (SEC)

regulations that shortened the holding periods required for purchasers of restricted

stocks to resell their interests. Ms. Vicelja determined the appropriate discount for

lack of marketability for the transferred interest using more recent studies, which

considered stocks with shorter holding periods.

[*25] Ms. Vicelja determined that Streightoff Investments was capable of making distributions during each of the years under consideration and that the partnership's overall financial condition and prospects are strong. Her report notes that the underlying assets of Streightoff Investments are highly liquid. She testified that the diversification and high liquidity of the assets would make an interest in the partnership highly attractive to a hypothetical buyer. The report determines that the amount of control provided by an 88.99% limited partnership interest is a factor favoring a lower discount. It also asserts that the right of first refusal provided for in the partnership agreement warrants a lower discount. Her report concludes that a discount for lack of marketability of 18% is appropriate.

The HFBE report asserts generally that longer required holding periods, riskier entities, and lower prospects for distributions indicate that a higher discount should be applied than that which respondent determined. Like Ms. Vicelja's report, the HFBE report cites data from restricted stock studies. However, it relies on older studies conducted when SEC regulations imposed the longest holding period requirements for restricted stocks. The estate's expert report assumes that the interest to be valued is an assignee interest and that the holder would have no ability to force liquidation. The report concludes that the predicted holding period required for the subject interest indicates a higher

[*26] discount relative to those reflected in the restricted stock studies. Mr. Harp testified that "a very long holding period expected * * * [is] one of the main drivers for lack of marketability discount".

The HFBE report states that the risk profile for an asset holding entity like Streightoff Investments is low compared to those of the operating companies that were considered in the restricted stock studies. It determines that, overall, the risk factors for the partnership indicate a lower discount for the interest at issue. With respect to the impact of the partnership's distribution policy, the report relies on statements made by partnership representatives that the partnership does not intend to make distributions in excess of the partners' tax liabilities for the foreseeable future. It acknowledges that the majority of the companies considered in the restricted stock studies also did not pay dividends but determines that the partnership's distribution policy warrants an increase in the applicable discount.

The HFBE report concludes that a 27.5% discount for lack of marketability is appropriate to apply to the transferred interest. Mr. Harp testified that his analysis for the lack of marketability discount would have included different considerations if the interest was a limited partnership interest with voting rights under the partnership agreement.

[*27] We agree with the experts that there should be a discount for the lack of marketability.  The estate's experts took into consideration that the interest they were valuing was an assignee interest, and this affected the conclusion in their report.  Since we concluded that the interest decedent transferred was a limited partnership interest, the estate's experts' valuation is too high.  The analysis in respondent's expert report is reasonable.  We conclude that the interest should be valued using an 18% discount rate for lack of marketability.

We have considered all of the arguments made by the parties, and to the extent we did not mention them above, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.